No. 23-1103

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

JOHN O. KALU,

*Plaintiff-Appellant,*

v.

MR. SPAULDING, Warden of FCI-Allenwood, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Pennsylvania, No. 3:19-cv-01621

## OPENING BRIEF OF PLAINTIFF-APPELLANT JOHN O. KALU

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW
Unit 26152
Washington, DC 20001
(202) 455-4399

David M. Zionts
Daniel G. Randolph
    *Counsel of Record*
Emma W. Keteltas
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5733

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 3

STATEMENT OF THE ISSUES PRESENTED ....................................... 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................. 5

STATEMENT OF THE CASE ................................................................. 6

I.     BACKGROUND ......................................................................... 6

II.    PROCEDURAL HISTORY ......................................................... 10

SUMMARY OF ARGUMENT .............................................................. 13

STANDARD OF REVIEW .................................................................... 17

ARGUMENT ....................................................................................... 17

I.     KALU STATES A VALID FAILURE-TO-PROTECT CLAIM
       AGAINST WARDEN SPAULDING BASED ON HIS PERSONAL
       DELIBERATE INDIFFERENCE, NOT *RESPONDEAT SUPERIOR* ........ 18

II.    KALU'S SEXUAL ASSAULT CLAIM AGAINST LT.
       MIDDERNATCH IS *BIVENS*-ELIGIBLE ................................... 24

       A.    Kalu's Sexual Assault Claim Does Not Meaningfully Depart
             from *Farmer* ..................................................................... 27

       B.    Separation-of-Powers Principles Confirm that a *Bivens* Remedy
             Is Appropriate for Kalu's Sexual Assault Claim .......................... 32

III.   KALU'S CONDITIONS-OF-CONFINEMENT CLAIM IS *BIVENS*-
       ELIGIBLE ................................................................................ 42

CONCLUSION .................................................................................... 45

CERTIFICATE OF COMPLIANCE ........................................................................ 46

CERTIFICATE OF BAR MEMBERSHIP ............................................................. 47

CERTIFICATE OF SERVICE ............................................................................... 48

ADDENDUM ..................................................................................................... A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................17, 21

*Atkinson v. Taylor*,
    316 F.3d 257 (3d Cir. 2003) ....................................................20, 22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................17

*Bistrian v. Levi*,
    912 F.3d 79 (3d Cir. 2018) ....................................................*passim*

*Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971)................................................................25, 38

*Boddie v. Schnieder*,
    105 F.3d 857 (2d Cir. 1997) ..........................................................30

*Boxer X v. Harris*,
    437 F.3d 1107 (11th Cir. 2006) ....................................................31

*Brooks v. Beard*,
    167 F. App'x 923 (3d Cir. 2006) ..................................................23

*Carlson v. Green*,
    446 U.S. 14 (1980)................................................5, 16, 25, 43

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001)..........................................................................42

*Davis v. Passman*,
    442 U.S. 228 (1979)........................................................................25

*Dooley v. Wetzel*,
    957 F.3d 366 (3d Cir. 2020) ..........................................................17

*Egbert v. Boule*,
    142 S. Ct. 1793 (2022)..............................................................*passim*

*Erickson v. Pardus,*
    551 U.S. 89 (2007) (per curiam) ..........................................................17

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ...............................................................*passim*

*Giron v. Corr. Corp. of Am.,*
    191 F.3d 1281 (10th Cir. 1999) .........................................................31

*Goodyear Atomic Corp. v. Miller,*
    486 U.S. 174 (1988) ...........................................................................37

*Hamilton v. Leavy,*
    117 F.3d 742 (3d Cir. 1997) ..............................................................23

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ..............................................................*passim*

*Hicks v. Ferreyra,*
    No. 22-1339, __ F.4th __, 2023 WL 2669648 (4th Cir. Mar. 29, 2023)............30

*Hudson v. McMillian,*
    503 U.S. 1 (1992) ...............................................................................18

*Hudson v. Palmer,*
    468 U.S. 517 (1984) ...........................................................................18

*A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.,*
    372 F.3d 572 (3d Cir. 2004) .........................................................20, 22

*Jones v. Unknown D.O.C. Bus Driver & Transp. Crew,*
    944 F.3d 478 (3d Cir. 2019) ..............................................................23

*Mack v. Yost,*
    968 F.3d 311 (3d Cir. 2020) ........................................................16, 44

*Mammana v. Barben,*
    856 F. App'x 411 (3d Cir. 2021) ...................................13, 16, 42, 43

*Michael v. Shiley, Inc.,*
    46 F.3d 1316 (3d Cir. 1995) ..............................................................43

*Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*,
   474 U.S. 494 (1986)......................................................................37

*Pinker v. Roche Holdings Ltd.*,
   292 F.3d 361 (3d Cir. 2002) ......................................................17

*Porter v. Nussle*,
   534 U.S. 516 (2002).....................................................................44

*Pressley v. Beard*,
   266 F. App'x 216 (3d Cir. 2008) ...............................................23

*Rhodes v. Chapman*,
   452 U.S. 337 (1981).........................................................14, 27, 44

*Ricks v. Shover*,
   891 F.3d 468 (3d Cir. 2018) ............................................15, 18, 29, 30

*Riley v. Jeffes*,
   777 F.2d 143 (3d Cir. 1985) ......................................................36

*Rode v. Dellarciprete*,
   845 F.2d 1195 (3d Cir. 1988) ....................................................23

*Santiago v. Warminster Twp.*,
   629 F.3d 121 (3d Cir. 2010) .............................................13, 20, 24

*Schwenk v. Hartford*,
   204 F.3d 1187 (9th Cir. 2000) ........................................30, 32, 36

*Shorter v. United States*,
   12 F.4th 366 (3d Cir. 2021) ...............................................*passim*

*United States v. Stanley*,
   483 U.S. 669 (1987).....................................................................40

*Warren Gen. Hosp. v. Amgen Inc.*,
   643 F.3d 77 (3d Cir. 2011) ........................................................17

*Wilson v. Seiter*,
   501 U.S. 294 (1991)..............................................................18, 43

*Young v. Quinlan*,
   960 F.2d 351 (3d Cir. 1992) .................................................................36

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017)...................................................................*passim*

**Constitutional Provisions**

U.S. Const. amend. VIII.......................................................................17

**Statutes**

18 U.S.C. § 4042 ...................................................................................32

28 U.S.C. § 1291 .....................................................................................3

28 U.S.C. § 1331 .....................................................................................3

28 U.S.C. § 2679 ...................................................................................41

34 U.S.C. § 30301 ...........................................................................*passim*

34 U.S.C. § 30302 ...........................................................................33, 35

34 U.S.C. § 30303 ...........................................................................34, 35

34 U.S.C. § 30305 ...................................................................................34

34 U.S.C. § 30306 ...........................................................................34, 35

34 U.S.C. § 30307 ...........................................................................34, 37

34 U.S.C. § 30309 ...................................................................................34

**Regulations**

28 C.F.R. § 115.52 .................................................................................38

*National Standards To Prevent, Detect, and Respond to Prison Rape*,
   77 Fed. Reg. 37,107 (June 30, 2012)............................................38, 41

**Other Authorities**

3d Cir. L.A.R. 28.1(a)(2) .........................................................................5

# INTRODUCTION

While incarcerated as an inmate at Allenwood Federal Correctional Institution, Mr. John O. Kalu was sexually assaulted on three separate occasions by the same prison official within the space of two months. Two of those sexual assaults happened in October 2016 while Mr. Kalu was housed in the general inmate population, and they unfolded in much the same way: Lt. Middernatch stopped Mr. Kalu on his way back from the cafeteria, separated him from the rest of the group, and grabbed and rubbed Mr. Kalu's genitals while verbally harassing him.

Mr. Kalu reported these incidents in an email to Warden Spaulding, who pledged that he would "look into the matter and then get back to" Mr. Kalu. The same day, Mr. Kalu was moved to the Special Housing Unit, but after a cursory investigation and over Mr. Kalu's objections, he was returned to the general inmate population. In early December 2016, Lt. Middernatch again sexually assaulted Mr. Kalu—this time not only grabbing and rubbing Mr. Kalu's genitals, but "forc[ing] his fingers into [Mr. Kalu's] anus."

Seeking redress for these incidents and the trauma that they caused, Mr. Kalu brought *Bivens* claims under the Eighth Amendment. He raised a failure-to-protect claim against Warden Spaulding for his deliberate indifference to the risk that Mr. Kalu would be sexually assaulted, and a sexual assault claim against Lt. Middernatch for perpetrating the assaults. Mr. Kalu also brought a conditions-of-confinement

claim against both Defendants for housing him in a subfreezing cell for months without adequate clothing following the above incidents.   The district court dismissed Mr. Kalu's claims without even addressing their merits.

It dismissed the failure-to-protect claim against Warden Spaulding on the misimpression that it was based a *respondeat superior* theory, but the claim was instead grounded in a settled theory of Eighth Amendment liability—under which a supervisor is personally liable for his own "deliberate indifference" to the substantial risk that an inmate may experience harm.   The district court failed to recognize that longstanding Eighth Amendment principle and ignored a long line of precedents from this Court recognizing supervisory liability under circumstances similar to Mr. Kalu's.

The district court also incorrectly dismissed Mr. Kalu's sexual assault claim against Lt. Middernatch after finding it ineligible for *Bivens* relief.   The court determined that the claim arose in a new *Bivens* "context," and that "special factors" counseled against recognizing a new *Bivens* remedy for the claim.   But Mr. Kalu's sexual assault claim arises in the same *Bivens* context as *Farmer v. Brennan*, 511 U.S. 825 (1994), which—as this Court has recognized—endorsed a *Bivens* action under the Eighth Amendment due to an inmate's sexual assault.   And through the Prison Rape Elimination Act of 2003 ("PREA"), Pub. L. 108–79, 117 Stat. 972, and its implementing regulations, Congress and the Executive Branch have expressed

their judgment that *Bivens* remedies should be available to deter sexual assault in the prison context. In the discrete setting of prison sexual assault, separation-of-powers principles do not counsel hesitation, but instead confirm that a *Bivens* remedy is proper.

The district court applied similarly flawed reasoning in dismissing Mr. Kalu's conditions-of-confinement claim. It relied heavily on an unpublished, split decision, and erroneously determined that the claim arose in a new *Bivens* context (despite Supreme Court precedents recognizing a *Bivens* remedy for similar claims) and that special factors counseled against any extension (based on a rationale that this Court has twice squarely rejected).

Being "assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 833–34 (cleaned up). Nor does the Constitution permit "inhumane" conditions of confinement. *Id.* at 832. Because Mr. Kalu has stated cognizable *Bivens* claims that Warden Spaulding and Lt. Middernatch violated the Eighth Amendment, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331 because it presents federal questions arising under the Eighth Amendment of the U.S. Constitution. This Court has jurisdiction over this appeal under 28 U.S.C.

§ 1291 because Mr. Kalu timely filed a notice of appeal on October 11, 2022 from the district court's September 23, 2022 final order dismissing all claims remaining in the case.  JA 50–51.

## STATEMENT OF THE ISSUES PRESENTED

1.    Whether the district court erred in dismissing Mr. Kalu's Eighth Amendment failure-to-protect claim against Warden Spaulding on the grounds that Warden Spaulding was not personally involved in carrying out the underlying sexual assaults, where the Warden was deliberately indifferent to a substantial risk that Mr. Kalu would be sexually assaulted.  *See* JA 20–23; Dkt. 23, Defs.' Br. in Supp. of Mot. to Dismiss or for Summ. J. ("Defs.' MTD") at 10–13; Dkt. 34, Pl.'s Opp'n to Defs.' MTD ¶ 7.[1]

2.    Whether the district court erred in dismissing Mr. Kalu's Eighth Amendment sexual assault claim against Lt. Middernatch, where the claim arises in the same context as *Farmer v. Brennan*, 511 U.S. 825 (1994), which endorsed a *Bivens* action based on the recognition that sexual assault may constitute cruel and unusual punishment under the Eighth Amendment; and where Congress and the Executive Branch have expressed their judgment—through enacting and implementing the Prison Rape Elimination Act ("PREA")—that *Bivens* remedies

---

[1] "Dkt." refers to documents in the district court proceeding below.  The docket report is reproduced at JA 52–58.

should be available to deter sexual assault in the prison context. *See* JA 44–46; Dkt. 57, Def. Middernatch's Br. in Supp. of Mot. to Dismiss ("Middernatch MTD") at 11–22; Dkt. 63, Pl.'s Opp'n to Middernatch MTD at 8–12.

3.    Whether the district court erred in dismissing Mr. Kalu's Eighth Amendment conditions-of-confinement claim, where the claim arises in a settled *Bivens* context under the Eighth Amendment as addressed in *Carlson v. Green*, 446 U.S. 14 (1980), and *Farmer v. Brennan*, 511 U.S. 825 (1994); and where no special factors counsel against recognizing a *Bivens* remedy for the claim. *See* JA 46–48; Dkt. 57, Middernatch MTD at 23–24; Dkt. 63, Pl.'s Opp'n to Middernatch MTD at 12–13.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

No related cases or proceedings have been completed, nor are any related cases or proceedings pending before, or about to be presented to, this Court or any other state or federal court or agency. *See* 3d Cir. L.A.R. 28.1(a)(2).

## STATEMENT OF THE CASE

## I.    BACKGROUND[2]

This case arises from three separate incidents of sexual assault that Mr. Kalu

suffered in late 2016, while housed at the Allenwood Federal Correctional Institution

("FCI Allenwood") in Allenwood, Pennsylvania.  *See* JA 65–66 (Compl. ¶¶ 1–4).[3]

All three assaults were perpetrated by Lieutenant K. Middernatch, a prison official.

*Id.*

The first sexual assault occurred on October 14, 2016.  *See* JA 65 (Compl.

¶ 2).  That day, while Mr. Kalu was returning from the cafeteria, Lt. Middernatch

"singled [him] out" and "pretend[ed] to pat [him] down."  *Id.*  During this sham pat

down, Lt. Middernatch "grabbed" Mr. Kalu's genitals and "started rubbing them

against [Lt. Middernatch's] hands saying 'You like that?'"  *Id.*   When Mr. Kalu did

not reply, Lt. Middernatch merely "smiled" and then asked Mr. Kalu to leave.  *Id.*

Mr. Kalu "felt humiliated" by this interaction and was "ashamed to tell his fellow

inmate[s]" about it.  *Id.*

---

[2] Because the Court "assume[s] the complaint's factual allegations are true at this stage," this brief "describe[s] the facts as [Mr. Kalu] reports them."  *Shorter v. United States*, 12 F.4th 366, 369 (3d Cir. 2021).

[3] Mr. Kalu is presently housed at the Folkston Immigration and Customs Enforcement ("ICE") Processing Center in Folkston, Georgia.  When his complaint was filed, Mr. Kalu was housed at the Victorville Federal Correctional Institution ("FCI Victorville") in Adelanto, California.  *See* JA 1.

Lt. Middernatch carried out a similar sexual assault against Mr. Kalu about two weeks later. *See* JA 66 (Compl. ¶ 3). On October 29, 2016, Mr. Kalu was again returning from the cafeteria when Lt. Middernatch "singled [him] out" and separated him from his "friends," which included two other inmates. *Id.* Again, while pretending to conduct a pat down, Lt. Middernatch "grabbed" Mr. Kalu's genitals and "started to squeez[e] and rub them against [Lt. Middernatch's] hands," asking Mr. Kalu "'What is this in your pocket?'" *Id.* Lt. Middernatch then "smiled at [Mr. Kalu] and said he thought it was some kitchen food items that [Mr. Kalu] was trying to smuggle out of the cafeteria." *Id.* When Mr. Kalu told Lt. Middernatch that he "felt assaulted and harassed," Lt. Middernatch responded: "[Y]ou haven't seen anything yet." *Id.*

A few days later, Mr. Kalu reported both of these sexual assaults to Warden Spaulding, who was "at all times relevant . . . . responsible for the operation and well[-]being of prisoners under his supervision." JA 67–68 (Compl. ¶¶ 5–6). Specifically, on November 2, 2016, Mr. Kalu "sent a confidential . . . email to Warden Spaulding regarding the aggressive [and] repet[i]tive sexual abuse [Mr. Kalu had] encountered [at] the hands of [Lt.] Middernatch." JA 67–68 (Compl. ¶ 6). Warden Spaulding "responded to [Mr. Kalu's] email" and stated that he would "look into the matter and then get back to" Mr. Kalu. *Id.*

Mr. Kalu did not hear further from Warden Spaulding, JA 68 (Compl. ¶ 6), but on November 2, 2016—*i.e.*, the same day Mr. Kalu sent the above email—Mr. Kalu was removed from the prison's "general population and placed in the Special Housing Unit," JA 68 (Compl. ¶ 7). Mr. Kalu remained in the Special Housing Unit through mid-November, and during this time, he did not experience any further sexual assaults or otherwise interact with Lt. Middernatch. Mr. Kalu resisted going back to the "general population because [he] fear[ed] for his life and . . . [feared] fac[ing] his assailant [Lt.] Middernatch." JA 69–70 (Compl. ¶ 11). But after learning on November 14 that Lt. Middernatch had "denied the allegation[s]," Mr. Kalu was nevertheless returned to the general population. JA 69 (Compl. ¶ 9). Warden Spaulding took no steps to discipline Lt. Middernatch or to mitigate the risk of another sexual assault. *See* JA 67–69 (Compl. ¶ 6–9). Instead, *Mr. Kalu* was punished for his initial refusal to return to the general population and for filing a complaint against Lt. Middernatch under the Prison Rape Elimination Act ("PREA"). *See* JA 67–68 (Compl. ¶¶ 6–7).

On December 1, 2016, Lt. Middernatch sexually assaulted Mr. Kalu for a third time. *See* JA 66–67 (Compl. ¶ 4). That morning, while Mr. Kalu was returning from breakfast in the cafeteria, Lt. Middernatch "was waiting outside the metal detector gate when he singled . . . out" Mr. Kalu and once again "pretend[ed] to pat him down." JA 66–67 (Compl. ¶ 4). Lt. Middernatch again "grabbed" Mr. Kalu's

genitals and "started to squeez[e] and rub them against [Lt. Middernatch's] hands," saying "'you like that.'"  JA 67 (Compl. ¶ 4).  When Mr. Kalu did not respond, Lt. Middernatch "forced his fingers into [Mr. Kalu's] anus," saying "'how about this?'"  JA 67 (Compl. ¶ 4).  Mr. Kalu reported this third sexual assault to Warden Spaulding via email (as Mr. Kalu had previously reported the first two incidents), but did not receive any response.  JA 67 (Compl. ¶ 4).

The above sexual assaults were not the only form of abuse Mr. Kalu experienced during this time.  For a period of "six month[s]" following the above incidents, Mr. Kalu was forced "to sleep on a cold steel metal bunk" in a room "with no heat."  JA 71 (Compl. ¶ 15).  The room was "10 degree[s] below freezing . . . during winter," and Mr. Kalu was deprived of warm clothing or even a "shirt."  JA 71 (Compl. ¶ 15).

Mr. Kalu continues to suffer mental anguish, including apparent post-traumatic stress disorder, as a result of these events.  *See* JA 73 (Compl. ¶ 17).  For example, since the sexual assaults, Mr. Kalu sometimes "wake[s] at night after experiencing nightmares of sexual assault," and his "fellow cell mates" have heard Mr. Kalu "cry out in distress during the night."  *Id.*  The nightmares have "not diminished" in "intensity" despite the passage of time.  *Id.*  Mr. Kalu also experiences "daytime flashbacks," "lapses of con[c]entration," and "outbreaks of

jitters" that range from "mild attack[s] of nerves" to an almost complete "loss of control." *Id.*

## II.  PROCEDURAL HISTORY

Mr. Kalu filed the complaint underlying this appeal on August 20, 2019, asserting violations of his constitutional rights and seeking compensatory and punitive damages, among other relief.  *See* JA 71–75 (Compl. ¶¶ 14–25).  Mr. Kalu claimed that Warden Spaulding and Lt. Middernatch had violated his Eighth Amendment "rights to be free from cruel and unusual punishment."  JA 71 (Compl. ¶¶ 14–15).  Specifically, Mr. Kalu alleged that (1) Warden Spaulding had through deliberate indifference failed to protect Mr. Kalu from sexual assault; (2) Lt. Middernatch had repeatedly perpetrated the sexual assaults; and (3) both Defendants had subjected Mr. Kalu to inhumane conditions of confinement by forcing him to sleep in a freezing cell for months without adequate clothing.  JA 67–68, 71 (Compl. ¶¶ 5–6, 14–15); *see also* Dkt. 34, Pl.'s Opp'n to Defs.' MTD ¶ 7 (alleging that Warden Spaulding "through deliberate indifference violated Plaintiff Kalu's Eight[h] Amend[ment] constitutional right[s]" because he "knew of a substantial risk of serious harm" to Mr. Kalu and "failed to respond reasonably").[4]

---

[4] Mr. Kalu also named Disciplinary Hearing Officer ("DHO") K. Bittenbender as a Defendant for his alleged role in imposing retaliatory sanctions in response to Mr. Kalu's filing of a PREA complaint, in violation of the First Amendment.  *See* JA 71–72 (Compl. ¶ 16).  The district court dismissed Mr. Kalu's retaliation claim against

On March 30, 2021, the district court granted in part and denied in part Defendants' combined motion to dismiss and motion for summary judgment.  *See* JA 1–32 (Dkt. 36, Opinion); JA 33–34 (Dkt. 37, Order).  The district court rejected Defendants' arguments that Mr. Kalu's claims were untimely and that he had failed to exhaust his administrative remedies, thus permitting the claims against Lt. Middernatch to remain in the case.  *See* JA 23–31.  But the court dismissed Mr. Kalu's claims against Warden Spaulding based on the mistaken understanding that the claims were based on a theory of "*respondeat superior*" or "vicarious liability"— or alternatively, that the claims alleged only "after-the-fact" conduct. JA 21.  The court considered it dispositive that there was no allegation Warden Spaulding knew about "Lt. Middernatch's alleged sexual assault . . . prior to the email Kalu sent on November 2, 2016."   JA 22.   The court did not explain how that timing was significant, however, given that Warden Spaulding *did* know about two of the sexual assaults several weeks before the third and most severe sexual assault took place.  *See* JA 66–68 (Compl. ¶¶ 4, 6).

---

Defendant Bittenbender, *see* JA 16–20, and Mr. Kalu does not challenge that ruling on appeal.

On September 23, 2022, the district court granted Lt. Middernatch's subsequent motion to dismiss, which disposed of Mr. Kalu's remaining claims.[5] JA 25–48 (Dkt. 68, Opinion); JA 49 (Dkt. 69, Order).    Specifically, the court concluded that his Eighth Amendment sexual assault claim against Lt. Middernatch presented "a new context under *Bivens*," even while noting that the Supreme Court and the Third Circuit had "previously established that a federal prisoner has a clearly established constitutional right to have prison officials protect him from . . . violence" and had "provided a [*Bivens*] remedy when an official violated that right." JA 45 & n.4 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994) and *Shorter v. United States*, 12 F.4th 366 (3d Cir. 2021)).    As a "special factor[] counseling hesitation" and thus precluding an extension of *Bivens*, the district court found it "significant that Congress, in passing the PREA opted not to include a private right of action for damages for inmates" experiencing sexual assault.    JA 45–46.    The court did not acknowledge that PREA's very text approvingly cited the Supreme Court's *Farmer*

---

[5] Mr. Kalu had filed an amended complaint on July 30, 2021, *see* JA 56 (Dkt. 46), and the Defendants moved to dismiss that complaint on September 13, *see* JA 56 (Dkt. 49), but Mr. Kalu moved to withdraw the amended complaint on September 27, *see* JA 56 (Dkt. 52).    On November 5, 2021, the district court granted Mr. Kalu's motion and denied the government's second motion to dismiss as moot.    *See* JA 56 (Dkt. 54).    Lt. Middernatch was thus the only remaining defendant, and on November 29, 2021, he filed a third motion to dismiss the remaining claims.    *see* JA 57 (Dkt. 56 & 57).

decision, which recognized a *Bivens* remedy for inmate sexual assault claims under the Eighth Amendment. *See infra* section II.B.

The district court also held that Mr. Kalu's conditions-of-confinement claim was a "new context under *Bivens*," relying on the "nonprecedential opinion in *Mammana v. Barben*, 856 Fed. App'x 411 (3d Cir. May 21, 2021)." JA 46. The court further determined that special factors counseled hesitation in this area because Mr. Kalu "had the BOP's administrative remedy process available to address his claims" and because Congress did not include a damages remedy in the Prison Litigation Reform Act. JA 47. The court thus "decline[d] to extend the *Bivens* remedy to this context" and dismissed Mr. Kalu's conditions-of-confinement claim. JA 48.

On October 11, 2022, Mr. Kalu timely noticed an appeal. JA 50–51.

## SUMMARY OF ARGUMENT

**I.** The district court erroneously dismissed Mr. Kalu's failure-to-protect claim against Warden Spaulding on the basis that the Warden did not personally participate in the underlying sexual assaults. *See* JA 20–23. It is settled that a supervisor can be personally liable for a constitutional tort if he "had knowledge of and acquiesced in his subordinates' violations," *Santiago v. Warminster Twp.*, 629 F.3d 121, 128–29 (3d Cir. 2010) (citation omitted), and "a prison official can[] be found liable under the Eighth Amendment" if he "knows of and disregards an

excessive risk to inmate health or safety," *Shorter v. United States*, 12 F.4th 366, 372 (3d Cir. 2021) (alteration in original) (citation omitted).  For these reasons, Eighth Amendment claims are frequently—and successfully—brought against prison wardens and other supervisory prison officials who were not personally involved in inflicting the alleged harms, yet personally violated the Constitution by exhibiting deliberate indifference to those harms.  Mr. Kalu's allegations against Warden Spaulding fall in this precise category.

**II.A.**  The district court was also wrong to dismiss Mr. Kalu's sexual assault claim against Lt. Middernatch on the grounds that it was not eligible for *Bivens* relief.  For one, the claim does not arise in a new *Bivens* context.  To "present[] a new *Bivens* context," a case must be "different in a meaningful way" from the Supreme Court's previous *Bivens* cases.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017).  But Mr. Kalu's sexual assault claim does not meaningfully depart from *Farmer v. Brennan*, 511 U.S. 825 (1994), where the Supreme Court recognized an Eighth Amendment *Bivens* remedy because sexual assault is "simply not 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Indeed, this Court has twice recognized that *Farmer* encompasses *Bivens* actions that arise in the sexual assault context.  *See Shorter*, 12 F.4th at 371; *Bistrian v. Levi*, 912 F.3d 79, 91 (3d Cir. 2018).  *Farmer* and these related precedents apply with even greater force when

14

the assault is not only permitted, but *perpetrated* by a prison official.  This Court and other courts of appeals have thus recognized that sexual assault claims brought directly against prison officials are grounded in *Farmer* and the Eighth Amendment. *See Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018).  For these reasons—along with other similarities between Mr. Kalu's case and *Farmer*—Mr. Kalu's sexual assault claim does not extend *Bivens* to a new context.

   **B.**    Even assuming Mr. Kalu's sexual assault claim implicates a new *Bivens* context, it would still be eligible for *Bivens* relief because no "special factors" counsel otherwise.  The special factors inquiry can "be condensed to one concern—respect for the separation of powers."  *Hernandez v. Mesa*, 140 S. Ct. 735, 749 (2020).   Here, through the enactment and implementation of the Prison Rape Elimination Act of 2003 ("PREA"), Congress and the Executive Branch have confirmed that a *Bivens* remedy is an appropriate measure to address and deter sexual assault in federal prisons.  PREA's text cites favorably to *Farmer v. Brennan*—the just-mentioned Supreme Court case that recognized an Eighth Amendment *Bivens* remedy in the sexual assault context.  And when promulgating regulations under PREA, the Department of Justice cited *Bivens* itself and confirmed that PREA *supplemented* rather than *supplanted* judicial remedies for constitutional violations. Because Congress and the Executive Branch relied on the availability of a *Bivens*

remedy for sexual assault-based claims when enacting and implementing PREA, it would contravene separation-of-powers principles to deny a *Bivens* remedy here.

**III.**    Finally, Mr. Kalu has a viable conditions-of-confinement *Bivens* claim under the Eighth Amendment based on his allegations that, for a period of six months, prison officials forced him "to sleep on a cold steel metal bunk" in a subfreezing room without warm clothing or even a "shirt." JA 71 (Compl. ¶ 15).  In ruling that the claim was not eligible for *Bivens* relief, the district court placed heavy reliance on this Court's unpublished, nonprecedential, divided decision in *Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021).  This Court should reverse the district court and adopt the persuasive reasoning outlined in the *Mammana* dissent.  *See* 856 F. App'x at 416–22 (Shwartz, J.).  Mr. Kalu's conditions-of-confinement claim does not differ meaningfully from the Eighth Amendment *Bivens* claims recognized in *Carlson v. Green*, 446 U.S. 14 (1980), or *Farmer v. Brennan*, and therefore does not extend *Bivens* to a new context.  Nor do any special factors counsel hesitation in recognizing a *Bivens* remedy here.  The district court reached the opposite conclusion because the Prison Litigation Reform Act lacks a "standalone damages remedy," JA 47, but this Court has twice rejected that exact argument, *see Mack v. Yost*, 968 F.3d 311, 324 (3d Cir. 2020); *Bistrian*, 912 F.3d at 93, and it is inconsistent with Supreme Court precedent, old and new.

## STANDARD OF REVIEW

When reviewing the dismissal of a complaint under Federal Rule of Procedure 12(b)(6), this Court "accept[s] all factual allegations as true, [and] construe[s] the complaint in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). A complaint survives a motion to dismiss as long as it "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And when a complaint is filed *pro se*—as it was here—the Court "construe[s] it liberally," *Shorter,* 12 F.4th at 371, applying "less stringent standards than [it would to] formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal quotation marks and citation omitted). This court reviews the dismissal of a complaint for failure to state a claim *de novo*. *See, e.g.*, *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020).

## ARGUMENT

The Eighth Amendment guarantees the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII. As a result, prison officials are subject to both "duties" and "restraints" when it comes to their treatment of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). For example, prison officials must "take reasonable measures to guarantee the safety of the inmates,"

*Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984), and must "ensure that inmates receive adequate food, clothing, shelter, and medical care," *Farmer*, 511 U.S. at 832. Prison officials are also forbidden from using "excessive physical force" or sexually assaulting prisoners under their care. *Id.*; *see also Ricks*, 891 F.3d at 473.

"A properly stated Eighth Amendment claim must allege a subjective and objective element." *Ricks*, 891 F.3d at 473 (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The subjective component requires a "sufficiently culpable state of mind," and the objective aspect requires conduct that is "sufficiently serious" to violate the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

As discussed below, Mr. Kalu has adequately alleged three Eighth Amendment claims—a failure-to-protect claim against Warden Spaulding, a sexual assault claim against Lt. Middernatch, and a conditions-of-confinement claim against both Defendants. This Court should reverse the district court and reinstate those claims.

## I.   KALU STATES A VALID FAILURE-TO-PROTECT CLAIM AGAINST WARDEN SPAULDING BASED ON HIS PERSONAL DELIBERATE INDIFFERENCE, NOT *RESPONDEAT SUPERIOR*

Warden Spaulding played a key role in the events surrounding the sexual assaults against Mr. Kalu. As set forth above, on November 2, 2016, Mr. Kalu emailed Warden Spaulding to report that he had twice been sexually assaulted by Lt. Middernatch within the previous few weeks. *See* JA 67–68 (Compl. ¶¶ 5–6).

Warden Spaulding "responded to [Mr. Kalu's] email" and stated that he would "look into the matter and then get back to" Mr. Kalu.  JA 67–68 (Compl. ¶ 6).  After briefly moving Mr. Kalu into the Special Housing Unit—where Lt. Middernatch did not have contact with Mr. Kalu—the Warden oversaw Mr. Kalu's transfer *back* to the general population without taking further steps to mitigate the risk of another sexual assault.  *See* JA 67–70 (Compl. ¶¶ 6, 11–12).  Soon thereafter, on December 1, 2016, Lt. Middernatch sexually assaulted Mr. Kalu for a third time, in the most severe of the three incidents.  *See* JA 66–67 (Compl. ¶ 4).  Mr. Kalu also reported this third sexual assault to Warden Spaulding via email, but did not receive any response. JA 66–67 (Compl. ¶ 4).  As Mr. Kalu explained in his *pro se* brief opposing the government's dismissal motion, this sequence of events plausibly illustrates the Warden's "deliberate indifference":  He "knew of a substantial risk of serious harm" to Mr. Kalu and yet "failed to respond reasonably."  Dkt. 34 ¶ 7.

Despite these allegations, the district court erroneously dismissed Mr. Kalu's failure-to-protect claim against the Warden.  This Court has repeatedly held that a failure-to-protect claim falls within an established *Bivens* context, *see Shorter*, 12 F.4th at 371; *Bistrian*, 912 F.3d at 91, and the district court did not question that proposition.  Instead, the district court misunderstood Kalu's claim as being based on the doctrine of "*respondeat superior*" or "vicarious liability," apparently because Warden Spaulding was not personally involved in the sexual assault.  *See* JA 20–23.

That ruling ignored basic principles of constitutional tort law, not to mention the Eighth Amendment context for Mr. Kalu's claim and binding circuit precedent.

This Court has repeatedly emphasized that "a supervisor may be personally liable" for a constitutional tort "if he or she participated in violating the plaintiff's rights, directed others to violate them, *or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations*." *Santiago*, 629 F.3d at 128–29 (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (emphasis added)). A knowledge-and-acquiescence theory of supervisory liability differs fundamentally from vicarious liability under *respondeat superior*, which "arises 'solely on the basis of the existence of an employer-employee relationship.'" *Santiago*, 629 F.3d at 128 (reversing district court ruling that erroneously conflated the two types of theories). Once a supervisor is on *notice* of the risk of a particular constitutional violation, he may be liable when the violation is perpetrated by those under his watch. *See, e.g.*, *Luzerne Cnty.*, 372 F.3d at 586 (sufficient evidence of knowledge and acquiescence where "incident reports prepared by . . . child-care workers [at juvenile detention facility] provided notice to their supervisors that [plaintiff] was being assaulted by other residents"); *see also Atkinson v. Taylor*, 316 F.3d 257, 270–71 (3d Cir. 2003) (same where plaintiff "either wrote or spoke to each supervisory defendant regarding . . . retaliatory harassment").

Further, in the Eighth Amendment context, it is especially obvious that a supervisory official need not personally carry out the alleged harm in order to be liable. *See Ashcroft*, 556 U.S. at 676 ("The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue."). That follows because "a prison official can[] be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement [if he or she] knows of and disregards an excessive risk to inmate health or safety." *Shorter*, 12 F.4th at 372 (alterations in original) (quoting *Farmer*, 511 U.S. at 837). Eighth Amendment claims are thus routinely brought against prison wardens and other supervisory prison officials who were not personally involved in inflicting the relevant harms, yet were on notice of a distinct risk to an inmate's safety. *See, e.g.*, *Farmer*, 511 U.S. at 825 (failure-to-protect claims brought against "Warden" and other "prison officials" based on evidence they were aware of heightened risk to inmate's safety); *Shorter*, 12 F.4th at 366, 370, 374 (failure-to-protect claims brought against "Warden," "Associate Warden[s]," and other "[p]rison leadership" where inmate "told prison officials about the risks she faced"); *Bistrian*, 912 F.3d at 79 (failure-to-protect claims brought against "Warden," "Assistant Warden[s]," and other prison officials who had "knowledge of . . . threats" made against plaintiff).

Mr. Kalu's allegations against Warden Spaulding follow in this line of cases. The Warden was plainly on notice of a heightened risk to Mr. Kalu's safety because

21

he not only *received* an email from Mr. Kalu that reported the two October 2016 sexual assaults, but *responded* to that email with a pledge to "look into the matter and . . . get back to" Mr. Kalu.  JA 67–68 (Compl. ¶ 6).  *See, e.g.*, *Shorter*, 12 F.4th at 374 (sufficient notice where inmate submitted a "grievance to the warden"); *see also Luzerne Cnty.*, 372 F.3d at 586 ("incident reports . . . provided notice . . . that [plaintiff] was being assaulted"); *Atkinson*, 316 F.3d at 270–71 (adequate notice where plaintiff contacted supervisors about harassment).  Mr. Kalu's allegations are also sufficient to support the plausible inference that the Warden disregarded an excessive risk to Mr. Kalu's safety by returning him to the general population without any mitigating measures to reduce the risk of another sexual assault.  *Accord, e.g.*, *Farmer*, 511 U.S. at 830 ("[a]fter an initial stay in administrative segregation," plaintiff was "placed in the . . . general population" and subsequently "beaten and raped"); *Bistrian*, 912 F.3d at 84 (prison officials knowingly "placed [plaintiff] in the recreation yard" with inmates who had previously threatened plaintiff).  The fact that Mr. Kalu went on to suffer a preventable third sexual assault that was remarkably similar to the two Warden Spaulding knew about—same perpetrator, same location, same *modus operandi*—further confirms the plausibility of the inference that the Warden was deliberately indifferent to a distinct risk of harm.

The district court failed to recognize the obvious parallels between Mr. Kalu's case and other controlling failure-to-protect precedents, and instead relied on cases

that are easily distinguishable because they involved inadequate allegations of knowledge on the part of the supervisor, asserted non-Eighth Amendment claims based on a standard other than deliberate indifference, or both.[6]  The district court also incorrectly analogized Mr. Kalu's case to those where the supervisors' only involvement in the alleged violation was the "after-the-fact" response to a grievance. *See, e.g.*, *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (prisoner could not bring inadequate medical treatment claim against "prison officials and administrators" merely because they "responded inappropriately to [his] later-filed grievance[] about his medical treatment"); *see also Pressley*, 266 F. App'x at 218 (similar).  Those sorts of claims fail for lack of causation, because an administrator's response to a grievance obviously cannot prevent the event that gives rise to the grievance.  *See, e.g.*, *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir. 1997)

---

[6] *See, e.g.*, *Jones v. Unknown D.O.C. Bus Driver & Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019) ("Superintendent" and "Security Captain" were improper defendants for access-to-the-courts claim where there were no allegations they had knowledge or involvement in the bus incidents underlying the claim); *Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008) ("Secretaries of the Department of Corrections" and "Superintendents" were improper defendants for free exercise, access-to-the-courts, and retaliation claims where they "were named only for their supervisory roles in the prison system"); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir. 1988) (Pennsylvania Governor was improper defendant for state police officer's retaliatory harassment claim because "[i]n a large state employing many thousands of employees," "merely transmitt[ing]" an administrative grievance was "insufficient to show . . . actual knowledge" of the harassment).

(explaining causation requirement).  But here, Mr. Kalu's claim is that Warden Spaulding's knowledge and deliberate indifference—evidenced by the email correspondence between Mr. Kalu and the Warden, and Mr. Kalu's quick return to the general population without any risk mitigation measures—*preceded* and causally contributed to Mr. Kalu's third and most severe sexual assault.  This Court should reverse the district court's erroneous dismissal of his failure-to-protect claim.[7]

## II.   KALU'S SEXUAL ASSAULT CLAIM AGAINST LT. MIDDERNATCH IS *BIVENS*-ELIGIBLE

In addition to bringing a failure-to-protect claim against Warden Spaulding, Mr. Kalu brought a claim directly against Lt. Middernatch—the perpetrator of the sexual assaults—alleging that Lt. Middernatch "violated [his] Eight[h] Amendment right to be free from cruel and unusual punishment through repet[i]tive sexual assault[s]."  JA 71 (Compl. ¶ 14).  The district court dismissed the claim on the grounds that it presented a new *Bivens* context, and that special factors counseled

---

[7] The district court did not separately address Mr. Kalu's conditions-of-confinement claim against Warden Spaulding, but that claim did not depend on a *respondeat superior* theory either.  Mr. Kalu alleged that the Warden was "at all times relevant . . . legally responsible for the operation and well[-]being of prisoners under his supervision," and that Mr. Kalu was housed in sub-freezing cell without adequate clothing for a period of "six month[s]."  JA 67, 71 (Compl. ¶¶ 5, 15).  It is more than plausible that Warden Spaulding "as the person in charge, had knowledge of and acquiesced in" these conditions-of-confinement violations.  *Santiago*, 629 F.3d at 128–29.

against recognizing a *Bivens* remedy for the claim.  JA 45–46.  Both rulings were incorrect, and either erroneous ruling provides a basis for reversal.

In *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized a cause of action for damages against federal officers who violate an individual's constitutional rights.  *Bivens* involved a claim under the Fourth Amendment's right against a warrantless arrest and search, 403 U.S. at 389, but over time the Supreme Court has recognized *Bivens* causes of action in other contexts.  In *Davis v. Passman*, 442 U.S. 228 (1979), the Court extended *Bivens* to permit claims based on gender discrimination under the Fifth Amendment's Due Process Clause.  And in *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized a *Bivens* remedy under the Eighth Amendment for a prisoner who was harmed by the denial of adequate medical treatment.

Of critical relevance here, in *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court endorsed a *Bivens* action under the Eighth Amendment against federal officers who fail to protect an inmate from violence—including sexual assault.  This Court has explained that *Farmer* "recognized a failure-to-protect claim under the Eighth Amendment" and is one of the relevant *Bivens* contexts that have been recognized by the Supreme Court.  *Bistrian*, 912 F.3d at 90–91.

More recently, the Supreme Court has clarified the standards that govern whether a *Bivens* remedy should be recognized in a given case.  That "inquiry . . .

proceed[s] in two steps." *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022). First, a court asks whether the case presents "a new *Bivens* context"—*i.e.*, whether it is "meaningful[ly]" different from the Supreme Court's previous *Bivens* cases. *Ziglar*, 137 S. Ct. at 1859. "If a case does not present a new *Bivens* context, the inquiry ends there, and a *Bivens* remedy is available." *Shorter*, 12 F.4th at 372. However, if a claim arises in a new context, then a court proceeds to ask whether "'special factors' indicat[e] that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 137 S. Ct. at 1858). The special factors analysis can "be condensed to one concern—respect for the separation of powers." *Hernandez*, 140 S. Ct. at 749.

Mr. Kalu's sexual assault claim does not meaningfully extend *Bivens* because it is grounded in—and involves an even starker violation of—the same Eighth Amendment right that animated *Farmer* in the same context of prison sexual assault. And even if this were considered a modest extension of *Bivens*, the special factors analysis mandates the recognition of a *Bivens* remedy here because Congress and the Executive Branch have sent a strong message through their enactment and implementation of PREA that *Bivens* remedies are an appropriate measure to deter and redress the unconstitutional sexual assault of prisoners.

### A. Kalu's Sexual Assault Claim Does Not Meaningfully Depart from *Farmer*

"[A] case presents a new *Bivens* context . . . [i]f the case is different in a *meaningful* way from previous *Bivens* cases decided by" the Supreme Court. *Ziglar*, 137 S. Ct. at 1859 (emphasis added). Mr. Kalu's sexual assault claim against Lt. Middernatch does not present a new *Bivens* context because it does not differ meaningfully from *Farmer*.

The *Farmer* opinion was grounded in the principle that "the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners," and who must "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. *Farmer* acknowledged that while prison conditions may be "restrictive and even harsh," being "assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 833–34 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). And *Farmer* recognized an Eighth Amendment *Bivens* claim under circumstances that closely resemble those presented here. Like Mr. Kalu, Farmer was "initial[ly]" housed in "administrative segregation" before being "placed in the . . . general population," where Farmer was sexually assaulted "[w]ithin two weeks" of the move. *Id.* at 830. These legal and factual similarities confirm that Mr. Kalu's case does not meaningfully depart from *Farmer*, and thus does not present a new *Bivens* context.

This Court has twice recognized that in light of *Farmer v. Brennan*, 511 U.S. 825 (1994), no new *Bivens* context is presented when prison officials are responsible for the assault of an inmate in their care.  In *Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018), Bistrian was attacked because prison officials placed him in a recreation yard with other inmates, even though the officials knew that those inmates had previously threatened Bistrian.  *Id.* at 84.  The Court concluded that "*Farmer* practically dictate[d] [its] ruling" that Bistrian's claim did "not call for any extension of *Bivens*."  *Id.* at 91.  Even though Bistrian "was a pretrial detainee at the time of the . . . [a]ttack," such that his claim arose "under the Fifth Amendment, not the Eighth Amendment," Bistrian's claim was "not 'different in a meaningful way' from the claim at issue in *Farmer*."  *Bistrian*, 912 F.3d at 91 (quoting *Ziglar*, 137 S. Ct. at 1859).  Similarly, in *Shorter v. United States*, 12 F.4th 366 (3d Cir. 2021), Shorter brought an Eighth Amendment claim that "involved . . . [inmates] who were housed in allegedly unsafe cells in the general population . . . where assaults" had been known to occur, and "who were physically and sexually assaulted."  *Id.* at 373.  The Court again concluded that *Farmer* "practically dictate[d] [the] ruling" that no new *Bivens* context was implicated.  *Id.* (quoting *Bistrian*, 912 F.3d at 91).

Like the assault-based claims in *Bistrian* and *Shorter*, Mr. Kalu's sexual assault claim against Lt. Middernatch does not meaningfully differ from *Farmer*.  If anything, Mr. Kalu's claim—brought against the prison official who himself

perpetrated the sexual assault—involves a more egregious violation of the same constitutional right in the same context. But it is an Eighth Amendment violation under *Farmer* just the same.

That much is clear from *Ricks v. Shover*, 891 F.3d 468 (3d Cir. 2018), where this Court confirmed in the "plainest terms" that sexual abuse by a prison official "can constitute 'cruel and unusual punishment' under the Eighth Amendment." *Id.* at 473. Notably, the Court grounded its opinion in "the Supreme Court's . . . holding in *Farmer v. Brennan* that sexual assaults of inmates by inmates can implicate the right to be free from cruel and unusual punishment," *id.* at 473–74, and repeatedly cited and quoted from *Farmer, see id.* at 473–75.

The *Ricks* Court also articulated a two-part standard for establishing an Eighth Amendment sexual assault claim—with objective and subjective components—that tracked the Eighth Amendment standard set forth in *Farmer*. *Compare Farmer*, 511 U.S. at 834 (stating "two requirements" for showing Eighth Amendment violation: the alleged deprivation "must be, objectively, sufficiently serious" and the "prison official must have a sufficiently culpable state of mind" (cleaned up)), *with Ricks*, 891 F.3d at 474–78 (sexual assault claim must be based on conduct that is both "objectively, sufficiently serious" and done with a "culpable state of mind").[8] The

---

[8] The *Ricks* Court confirmed that "sexualized fondling, coerced sexual activity, [and] combinations of ongoing harassment and abuse"—*i.e.*, the very types of abuse that

fact that Mr. Kalu's sexual assault claim relies on the same legal "inquiry" set out in *Farmer* further confirms that the two cases arise in the same context. *See, e.g.*, *Hicks v. Ferreyra*, No. 22-1339, __ F.4th __, 2023 WL 2669648, at \*6 (4th Cir. Mar. 29, 2023) (same *Bivens* context, despite factual differences, where "seizures in both cases were subject to the same objective inquiry of reasonableness mandated by Fourth Amendment jurisprudence").

*Ricks* "join[ed] numerous sister Circuits" that have held (unanimously) that sexual abuse carried out by prison officials is a cognizable Eighth Amendment violation. 891 F.3d at 473. Those other courts of appeals have similarly grounded their holdings in *Farmer*, applying common sense to conclude that *Farmer*'s admonitions in the context of inmate-on-inmate assault obviously apply when the prison official is the sexual abuser. *See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1198 (9th Cir. 2000) ("When the Supreme Court held in *Farmer* . . . that '[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society,' it did not qualify that statement depending on . . . whether the assault was committed by an inmate or a prison official[.]" (quoting *Farmer*, 511 U.S. at 834)); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("[L]ike the rape of an inmate by another inmate, sexual abuse of a prisoner by a

---

Mr. Kalu suffered—were sufficiently serious to offend the Eighth Amendment. *Id.* at 478.

corrections officer has no legitimate penological purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" (quoting *Farmer*, 511 U.S. at 834)); *accord Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999) (similar); *see also Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006) (citing *Farmer* and "recognizing that severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment").

In short, Mr. Kalu's sexual assault claim arises in the same constitutional context as the Eighth Amendment *Bivens* claim raised in *Farmer*. To the extent there are factual differences between Mr. Kalu's claim and the one presented in *Farmer*, those differences are not sufficiently *meaningful* to trigger a new *Bivens* context. For example, this is not a "cross-border" case that carries "foreign relations and national security implications," *Hernandez*, 140 S. Ct. at 739, nor does Mr. Kalu challenge "a high-level executive policy created in the wake of a major terrorist attack on American soil," *Ziglar*, 137 S. Ct. at 1860. As in *Farmer*, the material facts here concern specific actions and omissions at a federal correctional facility.

Other "instructive" considerations also confirm that Mr. Kalu's claim does not extend *Bivens* to a new context. *See Ziglar*, 137 S. Ct. at 1860 (listing "instructive" examples of differences that may be "meaningful enough to make a given context a new one"). For example, like the plaintiff in *Farmer*, Mr. Kalu does not challenge a "general[]" rule or practice but rather a "specific[]" set of actions

(*i.e.*, Lt. Middernatch's repeated sexual assaults). *See Ziglar*, 137 S. Ct. at 1860. Lt. Middernatch operated under the same "statutory . . . mandate," *Ziglar*, 137 S. Ct. at 1860, as the prison officials in *Farmer*. *See, e.g.*, 18 U.S.C. § 4042 ("The Bureau of Prisons . . . shall . . . provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States . . . ."). And as in *Farmer*, there was clear "judicial guidance" addressing the relevant constitutional problem, *Ziglar*, 137 S. Ct. at 1860, such that Lt. Middernatch was on notice that sexually assaulting an inmate was unconstitutional. *See, e.g.*, *Schwenk*, 204 F.3d at 1197 ("[T]he Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault [in 1994], and no reasonable prison guard could possibly have believed otherwise.").

### B.    Separation-of-Powers Principles Confirm that a *Bivens* Remedy Is Appropriate for Kalu's Sexual Assault Claim

Even assuming Mr. Kalu's sexual assault claim presents a new *Bivens* context, no "special factors" counsel against recognizing a *Bivens* remedy for that claim. *See, e.g.*, *Egbert*, 142 S. Ct. at 1803. To the contrary, through their enactment and implementation of PREA, Congress and the Executive Branch have affirmatively signaled their approval of *Bivens* remedies to deter sexual assault in prisons.

If a claim arises in a new *Bivens* context, then a court must ask whether "special factors" counsel against applying a *Bivens* remedy in that context. *See, e.g.*, *Egbert*, 142 S. Ct. at 1803. Potentially relevant special factors include the cost to

the government of recognizing a private cause of action; whether a claim challenges individual conduct or a broader policy; and the availability of alternative remedies. *See Ziglar*, 137 S. Ct. at 1856–63.  But the Supreme Court has more recently emphasized that the special factors analysis can "be condensed to one concern— respect for the separation of powers." *Hernandez*, 140 S. Ct. at 749; *see also id.* at 743 (explaining that "separation-of-powers principles" are "central" to the special factors analysis (quoting *Ziglar*, 137 S. Ct. at 1857)).  The overriding question is "whether the Judiciary is well suited, *absent congressional action or instruction*, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Hernandez*, 140 S. Ct. at 743 (quoting *Ziglar*, 137 S. Ct. at 1857) (emphasis added).

Here, "separation-of-powers principles," *Ziglar*, 137 S. Ct. at 1857, only confirm that a *Bivens* remedy should be recognized.  Through the enactment and implementation of PREA, Congress and the Executive Branch have affirmatively signaled that a damages remedy is an appropriate measure to address and deter sexual assault in federal prisons.  This Court should not "alter the framework established by the political branches." *Egbert*, 142 S. Ct. at 1808.

1.    PREA was enacted in 2003 with unanimous, bipartisan support of Congress to "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States." 34 U.S.C. § 30302(1).  The statute was based on the finding that prison rape—which the statute defined to cover all forms of sexual

assault[9]—was an "epidemic" problem that had "conservatively" resulted in "at least 13 percent of [U.S] inmates" being victimized. *Id.* § 30301(2), (12). Congress found that prison rape not only results in "day-to-day horror" and "severe physical and psychological effects" for victims, *id.* § 30301(6), (12), but also imposes major costs on public health and safety more generally, *see, e.g., id.* § 30301(7) (noting link between prison rape and spread of HIV/AIDS and other sexually transmitted diseases); *id.* § 30301(14)(E) (noting "increase[d] . . . risks of recidivism, civil strife, and violent crime by individuals who have been brutalized by prison rape").

The statute addressed this multi-faceted problem with a multi-faceted set of solutions. Among other things, the statute directed the Bureau of Justice Statistics to develop a "statistical review and analysis of the incidence and effects of prison rape," *id.* § 30303(a)(1); provided grants to fund efforts aimed at preventing prison rape, *see id.* § 30305(a); created a National Prison Rape Elimination Commission that was charged with drafting recommended national standards to address prison rape, *see id.* § 30306; and instructed the Department of Justice to finalize national standards within one year of receiving the Commission's recommendations, *see id.*

---

[9] *See* 34 U.S.C. § 30309(9)(A) (defining "rape" to include "the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will"); *see also id.* § 30309(11) (defining "sexual fondling" to include "the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification").

§ 30307. PREA's provisions make clear that the statute encompasses not only inmate-on-inmate sexual assaults, but sexual assaults perpetrated by prison officials. *See, e.g.*, *id.* § 30303(a)(2)(B) (directing the Bureau of Justice Statistics to consider "how . . . [to] collect information about *staff-on-inmate sexual assault*" (emphasis added)); *id.* § 30306(e)(2)(I), (L) (directing the National Prison Rape Elimination Commission to "recommend[] national standards relating to . . . the timely and comprehensive investigation of *staff sexual misconduct* involving rape or other sexual assault on inmates" and "data collection and reporting of … prison *staff sexual misconduct*" (emphasis added)).

     **2.**     Further, Congress signaled that constitutional tort litigation and *Bivens* remedies in particular were among the measures that would advance the statute's "zero-tolerance" policy for sexual assault in prisons.  34 U.S.C. § 30302(1).  The statute's findings included the acknowledgment that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution."  *Id.* § 30301(13).  Congress continued:  "In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court ruled that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment."  34 U.S.C. § 30301(13).  As this Court has put it, PREA "cites *Farmer* favorably in its preamble."  *Shorter*, 12 F.4th at 373 n.7.

That statutory endorsement of *Farmer v. Brennan* speaks volumes because, as discussed above, *see supra* section II.A, it was through *Farmer* that "the Supreme Court . . . pursuant to *Bivens*, recognized a failure-to-protect claim under the Eighth Amendment." *Bistrian*, 912 F.3d at 91; *see also id.* ("*Farmer* continues to be the case that most directly deals with whether a *Bivens* remedy is available for a failure-to-protect claim . . . ."). The fact that Congress "cite[d] *Farmer* favorably," *Shorter*, 12 F.4th at 373 n.7, invoked *Farmer* in the context of announcing a broad remedial effort to address sexual assault in prisons, and explicitly tied *Farmer* to the sexual assault context, is best understood as a "congressional . . . instruction" that a *Bivens* remedy is a necessary part of the solution to the widespread problem of prison sexual assault. *See Hernandez*, 140 S. Ct. at 743.

That reading is confirmed by the timing of PREA's enactment (in 2003), which not only post-dated *Farmer* (decided in 1994) but other decisions from the federal courts recognizing the availability of damages for Eighth Amendment claims arising in the sexual assault context.[10] It is "generally presume[d] that Congress is

---

[10] *See, e.g.*, *Young v. Quinlan*, 960 F.2d 351, 362 (3d Cir. 1992) (recognizing *Bivens* claim under Eighth Amendment based on prison officials' deliberate indifference towards inmate that was subject to "sexual assault on several documented occasions"); *see also Schwenk*, 204 F.3d at 1197 (recognizing that "the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault [in 1994]," such that "[t]he minimum consequences a sexually predatory guard should anticipate for such conduct is civil liability"); *Riley v. Jeffes*, 777 F.2d 143, 147–48 (3d Cir. 1985)

knowledgeable about existing law pertinent to the legislation it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988), and "if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific," *Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494, 501 (1986). Here, where Congress enacted sweeping legislation to address sexual assault in prisons against a backdrop of judicial decisions that recognized the availability of damages for unconstitutional sexual assault in prisons—and not only declined to disturb those decisions, but approvingly cited the leading Supreme Court case in this area—the obvious conclusion is that Congress sought to leave the judicial remedies intact.

**3.** Through its implementation of PREA, the Executive Branch has similarly signaled its view that *Bivens* remedies for unconstitutional sexual abuse are an appropriate complement to the statute's other measures. When DOJ finalized PREA standards via rulemaking pursuant to the statute, *see* 34 U.S.C. § 30307, it made clear that "[t]he standards are not intended to define the contours of constitutionally required conditions of confinement" and that compliance with the standards thus did "not establish a safe harbor with regard to otherwise

---

(recognizing "[a]n inmate's right to be protected from constant threats of violence and sexual assault from other inmates" and the potential for damages when prison officials are deliberately indifferent to the risk of such harm).

constitutionally deficient conditions involving inmate sexual abuse," *National Standards To Prevent, Detect, and Respond to Prison Rape*, 77 Fed. Reg. 37,106, 37,107 (June 30, 2012); *see also id.* at 37,119 (similar).  Consistent with that view, DOJ foresaw that prisoners who were victims of sexual abuse would have available "judicial remedies," either after exhausting their administrative remedies or—in prisons where sexual abuse complaints are exempted from administrative grievance systems—by "proceed[ing] to court directly." *Id.* at 37,158–59.  And DOJ explained that those "[f]ederal suits" would be subject to "applicable statute[s] of limitations," including—critically—"statute[s] of limitations [that] apply to actions against Federal officials filed under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)," 77 Fed. Reg. at 37,159 & n.35; *see also* 28 C.F.R. § 115.52(b)(4) (expressly allowing statute of limitations defense).  DOJ thus recognized the continuing propriety of *Bivens* claims in the prisoner sexual assault context.

4.    In short, there are no "sound reasons to . . . doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting" sexual abuse in prisons because the political branches have affirmatively signaled the opposite.  *Ziglar*, 137 S. Ct. at 1858.  Both Congress (through its enactment of PREA) and the Executive Branch (through its signing and implementation of PREA) have "weigh[ed] the costs and benefits of allowing a

damages action" arising from the unconstitutional sexual assault of prisoners, *Egbert*, 142 S. Ct. at 1805 (citation omitted), and have "instruct[ed]" that a *Bivens* remedy for such claims is appropriate, *Ziglar*, 137 S. Ct. at 1857.

For similar reasons, the district court had it backwards in finding it "significant" that Congress, when enacting PREA, did not include an express cause of action for inmates alleging unconstitutional sexual assaults. JA 46. The obvious reason why Congress did not expressly *create* such a remedy in PREA is that it recognized the remedy *already existed*. In other words, even if writing on a blank slate Congress might have been "better equipped to create a damages remedy," *Egbert*, 142 S. Ct. at 1803, in this instance Congress recognized the courts had already done so, and acted to supplement that framework. By citing *Farmer* in PREA's text, Congress made clear that it was relying on the damages remedy already in existence for inmates who experience sexual assault. *See* 34 U.S.C. § 30301(13); *see also supra* n.10 (collecting pre-PREA cases recognizing a damages remedy for prisoners experiencing sexual assault). A judicial declaration now—two decades after PREA's enactment—that such a remedy no longer exists would not respect the separation of powers but would undermine it, by upending the reasonable expectations that Congress and the Executive Branch built in to the PREA framework. In this discrete area, "respect for the separation of powers," *Hernandez*,

140 S. Ct. at 749, thus requires that a *Bivens* remedy be acknowledged for Eighth Amendment claims that arise from the sexual assault of prisoners.

**5.**    Other arguable "special factors" similarly do not counsel hesitation. *See Bistrian*, 912 F.3d at 90 (listing potentially applicable special factors).   The treatment of U.S. prisoners subject to Eighth Amendment protections does not implicate a sensitive policy domain—such as national security, foreign affairs, the military, or immigration—where courts are typically expected to play a limited role. *See, e.g.*, *Ziglar*, 137 S. Ct. at 1861; *Hernandez*, 140 S. Ct. at 744; *see also United States v. Stanley*, 483 U.S. 669, 683–84 (1987).   Congress has recognized that the sexual assault of prisoners is a widespread problem with heavy societal costs, *see* 34 U.S.C. § 30301, such that "the necessity to deter future violations" is especially great.  *Bistrian*, 912 F.3d at 90.   And claims arising from specific incidents of sexual assault—like Mr. Kalu's claims here—are "brought against [an] individual official for his or her own acts," not to challenge "an entity's policy."  *Ziglar*, 137 S. Ct. at 1860 (citation omitted); *see also Bistrian*, 912 F.3d at 93 (*Bivens* remedy appropriate where "claim challenge[d] particular individuals' actions or inaction in a particular incident—[*i.e.*,] the specific decision to place [Bistrian] in the yard with . . . other prisoners and then to not intervene when he was being savagely beaten").   To the contrary, a *Bivens* claim squarely advances the federal policy of "zero tolerance" for prison sexual assault codified in PREA.

Last, no "alternative remedial structure" counsels against applying a *Bivens* remedy here. *Egbert*, 142 S. Ct. at 1804 (quoting *Ziglar*, 137 S. Ct. at 1858). It is only when "Congress or the Executive has created a[n alternative] remedial process that it finds *sufficient* to secure an adequate level of deterrence" that a *Bivens* remedy is inappropriate. *Egbert*, 142 S. Ct. at 1807 (emphasis added). Through enacting and implementing PREA, however, Congress and the Executive communicated just the opposite—*i.e.*, that PREA's standards and remedies are not intended to be "sufficient" on their own. Those measures supplement but do not replace the substantive and procedural safeguards established under *Farmer* and enforceable through *Bivens* actions. *See, e.g.*, 34 U.S.C. § 30301(13); 77 Fed. Reg. at 37,159 & n.35; *see supra* pp. 35–38. Further, other remedial pathways (such as habeas proceedings) would be insufficient because Kalu is no longer housed at FCI Allenwood, *see supra* n.3, such that injunctive relief is not available and this is a "damages or nothing" case. *Ziglar*, 137 S. Ct. at 1862. And it is settled in this circuit that "the prospect of relief under the FTCA [Federal Tort Claims Act] is . . . not a special factor counseling hesitation in allowing a *Bivens* remedy." *Bistrian*, 912 F.3d at 92.[11]

---

[11] By enacting the FTCA, "Congress made clear that it was not attempting to abrogate *Bivens*." *Hernandez*, 140 S. Ct. at 748 n.9 (citing 28 U.S.C. § 2679(b)(2)(A)). Because *Bivens* alone permits recovery against individuals, it is "crystal clear that Congress intended the FTCA and *Bivens* to serve as parallel and

## III. KALU'S CONDITIONS-OF-CONFINEMENT CLAIM IS *BIVENS*-ELIGIBLE

In addition to being sexually assaulted, Mr. Kalu was also forced to endure inhumane conditions of confinement while housed at FCI-Allenwood. Specifically, during a period of "six month[s]," Mr. Kalu was forced "to sleep on a cold steel metal bunk" in a room "with no heat." JA 71 (Compl. ¶ 15). The room was "10 degree[s] below freezing . . . during winter," and Mr. Kalu was deprived of warm clothing or even a "shirt." JA 71 (Compl. ¶ 15). Based on these allegations, Mr. Kalu brought conditions-of-confinement claims under the Eighth Amendment. *See* JA 71 (Compl. ¶ 15).

The district court dismissed those claims by relying heavily on this Court's "nonprecedential opinion" in *Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021). JA 46. Specifically, the district court concluded that Mr. Kalu's conditions-of-confinement claim presented a new *Bivens* context and that special factors counseled against a *Bivens* extension. JA 46–48. That was wrong on both counts. This Court should reverse the district court, embrace the reasoning outlined in the *Mammana*

complementary sources of liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (cleaned up). In its most recent *Bivens* decision, for example, the Supreme Court did not consider the availability of the FTCA as a special factor counseling against relief, even though that argument was pressed. *See Egbert*, 142 S. Ct. at 1806–07.

dissent, *see Mammana*, 856 F. App'x at 416–22 (Shwartz, J.), and reinstate Mr. Kalu's conditions-of-confinement claim.[12]

*First*, Mr. Kalu's conditions-of-confinement claim does not present a new *Bivens* context because it does not differ meaningfully from *Carlson v. Green* or *Farmer v. Brennan*, both of which recognized a *Bivens* remedy for an Eighth Amendment claim based on unconstitutional conditions of confinement. *See Carlson*, 446 U.S. at 17–19; *Farmer*, 511 U.S. at 830, 839–40. While *Carlson* addressed inadequate medical treatment and *Farmer* involved a failure-to-protect claim, they were grounded in the same Eighth Amendment right to "receive adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832; *see also Wilson*, 501 U.S. at 303 ("no significant distinction between claims alleging inadequate medical care and those alleging inadequate 'conditions of confinement'"). Mr. Kalu's conditions-of-confinement claim also resembles those in *Carlson* and *Farmer* in other fundamental respects—for example, he challenges not a policy but the specific actions of individual officers (the decision to house him in a freezing cell without adequate clothing over a six-month period), and as with inadequate

---

[12] This Court is not bound by *Mammana* because it is an unpublished opinion that "pursuant to [Internal Operating Procedure] 5.7, does not constitute binding precedent." *Mammana*, 856 F. App'x at 411; *see also, e.g., Michael v. Shiley, Inc.*, 46 F.3d 1316, 1332 n.11 (3d Cir. 1995) ("We, of course, are not bound by an unpublished disposition of our court.").

medical treatment or failure-to-protect claims, there is longstanding judicial guidance on which conditions of confinement "deprive inmates of the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

*Second*, no special factors counsel hesitation in applying a *Bivens* remedy to Mr. Kalu's conditions-of-confinement claim, even assuming it arises in a new context. The district court based its contrary ruling on "Congress's omission of a 'standalone damages remedy against federal jailers' . . . [from] the Prison Litigation Reform Act [PLRA]." JA 47. But this Court has *twice* "reject[ed] the argument that Congressional silence within the PLRA suggests that Congress did not want a damages remedy against prison officials for constitutional violations." *Mack v. Yost*, 968 F.3d 311, 324 (3d Cir. 2020). Because the PLRA "regulates how *Bivens* actions are brought," it "cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all." *Bistrian*, 912 F.3d at 93; *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) (holding that "federal prisoners suing under [*Bivens*] must first exhaust inmate grievance procedures"). In other words, by enacting a statute that requires prisoners to utilize the BOP's grievance process before filing a *Bivens* suit, Congress necessarily "weigh[ed] the costs and benefits of allowing a [prisoner's] damages action to proceed" under *Bivens*. *Egbert*, 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1858). The PLRA's structure reflects Congress's determination

that the BOP process, standing alone, is not "sufficient to secure an adequate level of deterrence." *Egbert*, 142 S. Ct. at 1805. This Court should not second-guess that judgment.

## CONCLUSION

For the above reasons, this Court should reverse the judgment of the district court. Mr. Kalu has stated plausible failure-to-protect, sexual assault, and conditions-of-confinement claims that are eligible for *Bivens* relief under the Eighth Amendment.

Dated: April 20, 2023

Respectfully submitted,

/s/ Daniel G. Randolph

Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Avenue NW
Unit 26152
Washington, DC 20001
(202) 455-4399

David M. Zionts
Daniel G. Randolph (D.C. Bar # 230150)
    *Counsel of Record*
Emma W. Keteltas
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5733

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 10,825 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2016 in 14-point Times New Roman font.

3.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

4.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program, Advanced Endpoint Protection Cortex XDR Agent v. 7.9.0, has been run on the file, and no virus was detected.

Dated: April 20, 2023

/s/ Daniel G. Randolph
Daniel G. Randolph (D.C. Bar # 230150)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5053

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that the following attorneys whose names appear on the brief are members of the bar of this Court:

Daniel G. Randolph

Samuel Weiss

David M. Zionts

Dated: April 20, 2023

/s/ Daniel G. Randolph
Daniel G. Randolph (D.C. Bar # 230150)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5053

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div style="margin-left: 50%;">

*/s/ Daniel G. Randolph*
Daniel G. Randolph (D.C. Bar # 230150)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5053

*Counsel for Plaintiff-Appellant*

</div>

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

34 U.S.C. § 30301 ................................................................ A-1

34 U.S.C. § 30302 ................................................................ A-5

34 U.S.C. § 30303 ................................................................ A-6

34 U.S.C. § 30305 ................................................................ A-7

34 U.S.C. § 30306 ................................................................ A-8

34 U.S.C. § 30307 ................................................................ A-12

34 U.S.C. § 30309 ................................................................ A-13

**34 U.S.C. § 30301        Findings**

Congress makes the following findings:

(1) 2,100,146 persons were incarcerated in the United States at the end of 2001: 1,324,465 in Federal and State prisons and 631,240 in county and local jails. In 1999, there were more than 10,000,000 separate admissions to and discharges from prisons and jails.

(2) Insufficient research has been conducted and insufficient data reported on the extent of prison rape. However, experts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison. Many inmates have suffered repeated assaults. Under this estimate, nearly 200,000 inmates now incarcerated have been or will be the victims of prison rape. The total number of inmates who have been sexually assaulted in the past 20 years likely exceeds 1,000,000.

(3) Inmates with mental illness are at increased risk of sexual victimization. America's jails and prisons house more mentally ill individuals than all of the Nation's psychiatric hospitals combined. As many as 16 percent of inmates in State prisons and jails, and 7 percent of Federal inmates, suffer from mental illness.

(4) Young first-time offenders are at increased risk of sexual victimization. Juveniles are 5 times more likely to be sexually assaulted in adult rather than juvenile facilities--often within the first 48 hours of incarceration.

(5) Most prison staff are not adequately trained or prepared to prevent, report, or treat inmate sexual assaults.

(6) Prison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault--if they receive treatment at all.

(7) HIV and AIDS are major public health problems within America's correctional facilities. In 2000, 25,088 inmates in Federal and State prisons were known to be infected with HIV/AIDS. In 2000, HIV/AIDS accounted for more than 6 percent of all deaths in Federal and State prisons. Infection rates for other sexually transmitted diseases, tuberculosis, and hepatitis B and C are also far greater for prisoners than for the American population as a whole. Prison rape undermines the public health by contributing to the spread of these diseases, and often giving a

potential death sentence to its victims.

(8) Prison rape endangers the public safety by making brutalized inmates more likely to commit crimes when they are released--as 600,000 inmates are each year.

(9) The frequently interracial character of prison sexual assaults significantly exacerbates interracial tensions, both within prison and, upon release of perpetrators and victims from prison, in the community at large.

(10) Prison rape increases the level of homicides and other violence against inmates and staff, and the risk of insurrections and riots.

(11) Victims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison. They are thus more likely to become homeless and/or require government assistance.

(12) Members of the public and government officials are largely unaware of the epidemic character of prison rape and the day-to-day horror experienced by victimized inmates.

(13) The high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution. In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court ruled that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment. The Eighth Amendment rights of State and local prisoners are protected through the Due Process Clause of the Fourteenth Amendment. Pursuant to the power of Congress under Section Five of the Fourteenth Amendment, Congress may take action to enforce those rights in States where officials have demonstrated such indifference. States that do not take basic steps to abate prison rape by adopting standards that do not generate significant additional expenditures demonstrate such indifference. Therefore, such States are not entitled to the same level of Federal benefits as other States.

(14) The high incidence of prison rape undermines the effectiveness and efficiency of United States Government expenditures through grant programs such as those dealing with health care; mental health care; disease prevention; crime prevention, investigation, and prosecution; prison construction, maintenance, and operation; race relations; poverty; unemployment and homelessness. The effectiveness and efficiency of these federally funded grant programs are compromised by the failure

of State officials to adopt policies and procedures that reduce the incidence of prison rape in that the high incidence of prison rape--

(A) increases the costs incurred by Federal, State, and local jurisdictions to administer their prison systems;

(B) increases the levels of violence, directed at inmates and at staff, within prisons;

(C) increases health care expenditures, both inside and outside of prison systems, and reduces the effectiveness of disease prevention programs by substantially increasing the incidence and spread of HIV, AIDS, tuberculosis, hepatitis B and C, and other diseases;

(D) increases mental health care expenditures, both inside and outside of prison systems, by substantially increasing the rate of post-traumatic stress disorder, depression, suicide, and the exacerbation of existing mental illnesses among current and former inmates;

(E) increases the risks of recidivism, civil strife, and violent crime by individuals who have been brutalized by prison rape; and

(F) increases the level of interracial tensions and strife within prisons and, upon release of perpetrators and victims, in the community at large.

(15) The high incidence of prison rape has a significant effect on interstate commerce because it increases substantially--

(A) the costs incurred by Federal, State, and local jurisdictions to administer their prison systems;

(B) the incidence and spread of HIV, AIDS, tuberculosis, hepatitis B and C, and other diseases, contributing to increased health and medical expenditures throughout the Nation;

(C) the rate of post-traumatic stress disorder, depression, suicide, and the exacerbation of existing mental illnesses among current and former inmates, contributing to increased health and medical expenditures throughout the Nation; and

(D) the risk of recidivism, civil strife, and violent crime by individuals who have been brutalized by prison rape.

**34 U.S.C. § 30302**          **Purposes**

The purposes of this chapter are to—

(1) establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States;

(2) make the prevention of prison rape a top priority in each prison system;

(3) develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape;

(4) increase the available data and information on the incidence of prison rape, consequently improving the management and administration of correctional facilities;

(5) standardize the definitions used for collecting data on the incidence of prison rape;

(6) increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape;

(7) protect the Eighth Amendment rights of Federal, State, and local prisoners;

(8) increase the efficiency and effectiveness of Federal expenditures through grant programs such as those dealing with health care; mental health care; disease prevention; crime prevention, investigation, and prosecution; prison construction, maintenance, and operation; race relations; poverty; unemployment; and homelessness; and

(9) reduce the costs that prison rape imposes on interstate commerce.

**34 U.S.C. § 30303        National prison rape statistics, data, and research**

(a) Annual comprehensive statistical review

(1) In general

The Bureau of Justice Statistics of the Department of Justice (in this section referred to as the "Bureau") shall carry out, for each calendar year, a comprehensive statistical review and analysis of the incidence and effects of prison rape. The statistical review and analysis shall include, but not be limited to the identification of the common characteristics of--

(A) both victims and perpetrators of prison rape; and

(B) prisons and prison systems with a high incidence of prison rape.

(2) Considerations

In carrying out paragraph (1), the Bureau shall consider--

(A) how rape should be defined for the purposes of the statistical review and analysis;

(B) how the Bureau should collect information about staff-on-inmate sexual assault;

(C) how the Bureau should collect information beyond inmate self-reports of prison rape;

(D) how the Bureau should adjust the data in order to account for differences among prisons as required by subsection (c)(3);

(E) the categorization of prisons as required by subsection (c)(4); and

(F) whether a preliminary study of prison rape should be conducted to inform the methodology of the comprehensive statistical review.

* * *

**34 U.S.C. § 30305**        **Grants to protect inmates and safeguard communities**

(a) Grants authorized

From amounts made available for grants under this section, the Attorney General shall make grants to States to assist those States in ensuring that budgetary circumstances (such as reduced State and local spending on prisons) do not compromise efforts to protect inmates (particularly from prison rape) and to safeguard the communities to which inmates return. The purpose of grants under this section shall be to provide funds for personnel, training, technical assistance, data collection, and equipment to prevent and prosecute prisoner rape.

* * *

**34 U.S.C. § 30306**        **National Prison Rape Elimination Commission**

(a) Establishment

There is established a commission to be known as the National Prison Rape Elimination Commission (in this section referred to as the "Commission").

(b) Members

  (1) In general

  The Commission shall be composed of 9 members, of whom--

  (A) 3 shall be appointed by the President;

  (B) 2 shall be appointed by the Speaker of the House of Representatives, unless the Speaker is of the same party as the President, in which case 1 shall be appointed by the Speaker of the House of Representatives and 1 shall be appointed by the minority leader of the House of Representatives;

  (C) 1 shall be appointed by the minority leader of the House of Representatives (in addition to any appointment made under subparagraph (B));

  (D) 2 shall be appointed by the majority leader of the Senate, unless the majority leader is of the same party as the President, in which case 1 shall be appointed by the majority leader of the Senate and 1 shall be appointed by the minority leader of the Senate; and

  (E) 1 member appointed by the minority leader of the Senate (in addition to any appointment made under subparagraph (D)).

  (2) Persons eligible

  Each member of the Commission shall be an individual who has knowledge or expertise in matters to be studied by the Commission.

  (3) Consultation required

  The President, the Speaker and minority leader of the House of Representatives, and the majority leader and minority leader of the Senate shall consult with one

another prior to the appointment of the members of the Commission to achieve, to the maximum extent possible, fair and equitable representation of various points of view with respect to the matters to be studied by the Commission.

(4) Term

Each member shall be appointed for the life of the Commission.

(5) Time for initial appointments

The appointment of the members shall be made not later than 60 days after September 4, 2003.

(6) Vacancies

A vacancy in the Commission shall be filled in the manner in which the original appointment was made, and shall be made not later than 60 days after the date on which the vacancy occurred.

* * *

(e) Recommendations

(1) In general

In conjunction with the report submitted under subsection (d)(3), the Commission shall provide the Attorney General and the Secretary of Health and Human Services with recommended national standards for enhancing the detection, prevention, reduction, and punishment of prison rape.

(2) Matters included

The information provided under paragraph (1) shall include recommended national standards relating to--

(A) the classification and assignment of prisoners, using proven standardized instruments and protocols, in a manner that limits the occurrence of prison rape;

(B) the investigation and resolution of rape complaints by responsible prison authorities, local and State police, and Federal and State prosecution authorities;

(C) the preservation of physical and testimonial evidence for use in an investigation of the circumstances relating to the rape;

(D) acute-term trauma care for rape victims, including standards relating to--

    (i) the manner and extent of physical examination and treatment to be provided to any rape victim; and

    (ii) the manner and extent of any psychological examination, psychiatric care, medication, and mental health counseling to be provided to any rape victim;

(E) referrals for long-term continuity of care for rape victims;

(F) educational and medical testing measures for reducing the incidence of HIV transmission due to prison rape;

(G) post-rape prophylactic medical measures for reducing the incidence of transmission of sexual diseases;

(H) the training of correctional staff sufficient to ensure that they understand and appreciate the significance of prison rape and the necessity of its eradication;

(I) the timely and comprehensive investigation of staff sexual misconduct involving rape or other sexual assault on inmates;

(J) ensuring the confidentiality of prison rape complaints and protecting inmates who make complaints of prison rape;

(K) creating a system for reporting incidents of prison rape that will ensure the confidentiality of prison rape complaints, protect inmates who make prison rape complaints from retaliation, and assure the impartial resolution of prison rape complaints;

(L) data collection and reporting of--

    (i) prison rape;

    (ii) prison staff sexual misconduct; and

    (iii) the resolution of prison rape complaints by prison officials and Federal,

State, and local investigation and prosecution authorities; and

(M) such other matters as may reasonably be related to the detection, prevention, reduction, and punishment of prison rape.

(3) Limitation

The Commission shall not propose a recommended standard that would impose substantial additional costs compared to the costs presently expended by Federal, State, and local prison authorities.

\* \* \*

### 34 U.S.C. § 30307    Adoption and effect of national standards

(a) Publication of proposed standards

(1) Final rule

Not later than 1 year after receiving the report specified in section 30306(d)(3) of this title, the Attorney General shall publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape.

(2) Independent judgment

The standards referred to in paragraph (1) shall be based upon the independent judgment of the Attorney General, after giving due consideration to the recommended national standards provided by the Commission under section 30306(e) of this title, and being informed by such data, opinions, and proposals that the Attorney General determines to be appropriate to consider.

(3) Limitation

The Attorney General shall not establish a national standard under this section that would impose substantial additional costs compared to the costs presently expended by Federal, State, and local prison authorities. The Attorney General may, however, provide a list of improvements for consideration by correctional facilities.

(4) Transmission to States

Within 90 days of publishing the final rule under paragraph (1), the Attorney General shall transmit the national standards adopted under such paragraph to the chief executive of each State, the head of the department of corrections of each State, and to the appropriate authorities in those units of local government who oversee operations in one or more prisons.

(b) Applicability to Federal Bureau of Prisons

The national standards referred to in subsection (a) shall apply to the Federal Bureau of Prisons immediately upon adoption of the final rule under subsection (a)(4).

* * *

**34 U.S.C. § 30309**         **Definitions**

In this chapter, the following definitions shall apply:

* * *

(9) Rape

The term "rape" means--

(A) the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will;

(B) the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person not forcibly or against the person's will, where the victim is incapable of giving consent because of his or her youth or his or her temporary or permanent mental or physical incapacity; or

(C) the carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling of a person achieved through the exploitation of the fear or threat of physical violence or bodily injury.

(10) Sexual assault with an object

The term "sexual assault with an object" means the use of any hand, finger, object, or other instrument to penetrate, however slightly, the genital or anal opening of the body of another person.

(11) Sexual fondling

The term "sexual fondling" means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification.

* * *