PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-1103

_____

JOHN O. KALU,
Appellant

v.

MR. SPAULDING, Warden of FCI-Allenwood;
K. MIDDERNATCH, Lieutenant/FCI-Allenwood;
K. BITTENBENDER, Discipline Hearing Officer (DHO)
FCI-Allenwood

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3-19-cv-01621)
District Judge: Honorable Jennifer P. Wilson

_____

ARGUED:  November 9, 2023

Before:  RESTREPO, SCIRICA, and SMITH, *Circuit Judges*.

(Filed: August 21, 2024)

Daniel G. Randolph [ARGUED]
David M. Zionts
Covington & Burling
850 10th Street NW
One City Center
Washington, DC  20001

Samuel Weiss
Rights Behinds Bars
416 Florida Avenue NW
Unit 26152
Washington, DC  20001

    *Counsel for Appellant*

Richard Euliss [ARGUED]
Carlo D. Marchioli
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N. 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA  17102

    *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

**SCIRICA**, *Circuit Judge*

Five decades ago, in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court first authorized an implied damages remedy for constitutional claims brought against federal officials. Since then, in recognition of the Constitution's separation of legislative and judicial power, the Court has greatly narrowed the availability of new *Bivens* actions. "At bottom, creating a cause of action is a legislative endeavor." *Egbert v. Boule*, 596 U.S. 482, 491 (2022).

Here, appellant John O. Kalu, a federal inmate, seeks to bring Eighth Amendment claims against federal prison officials. He alleges a prison guard sexually assaulted him on three separate occasions, prison officers subjected him to inhumane conditions of confinement, and the prison's Warden failed to protect him from the abuse through deliberate indifference. He seeks damages under *Bivens* to redress those harms. Heeding the Supreme Court's recent and repeated warning that we must exercise "caution" before implying a damages remedy under the Constitution, *see id.*; *Hernandez v. Mesa*, 589 U.S. 93, 100–01 (2020), we decline to extend the *Bivens* remedy to Kalu's claims. For the following reasons, we will affirm.

I.[1]

In 2016, John O. Kalu was an inmate at the Allenwood

---

[1] The following facts are taken from the complaint, J.A. 59–81, and are assumed as true with all reasonable inferences drawn in the plaintiff's favor. *See Haberle v. Borough of Nazareth*, 936 F.3d 138, 140 n.1 (3d Cir. 2019). We are also mindful that

Federal Correctional Institution ("FCI Allenwood") in Allenwood, Pennsylvania. While housed at FCI Allenwood, Kalu was sexually assaulted on three separate occasions. According to Kalu, the abuse was perpetrated by a prison official, defendant Lieutenant K. Middernatch ("Lt. Middernatch"), and the correctional facility's Warden, defendant Warden Spaulding ("Warden Spaulding"), failed to prevent further assaults through deliberate indifference. In addition, Kalu alleges both defendants subjected him to inhumane conditions of confinement following the incidents of sexual assault.

## A.

The first incident of sexual assault occurred on October 14, 2016. Kalu was returning from the cafeteria when Lt. Middernatch "singled [him] out and pretend[ed] to pat [him] down." J.A. 65. During the interaction, Lt. Middernatch grabbed Kalu's genitals while smiling and asking, "You like that?" *Id.* Kalu did not reply and felt "humiliated." *Id.*

Two weeks later, Kalu was sexually assaulted for a second time. Kalu was again returning from the cafeteria when Lt. Middernatch "singled [him] out" and pretended to conduct a pat down. *Id.* at 66. Like the previous encounter, Lt. Middernatch grabbed Kalu's genitals and "started to squeez[e] and rub them against his hands" while asking Kalu, "What is this in your pocket?" *Id.* When Kalu did not reply, Lt. Middernatch stated he thought Kalu was trying to smuggle

---

a *pro se* litigant's complaint is to be construed liberally. *See Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004).

food items out of the cafeteria. Kalu then told Lt. Middernatch he "felt assaulted and harassed," and Lt. Middernatch responded, "you haven't seen anything yet." *Id.*

On November 2, 2016, Kalu reported the two incidents of sexual assault to Warden Spaulding. Specifically, Kalu sent Warden Spaulding a confidential electronic email "regarding the aggressive repetitive sexual abuse [he] encountered in the hands of" Lt. Middernatch. *Id.* at 67–68. Warden Spaulding responded to Kalu's email stating he would "look into the matter and then get back to [him]," but Kalu never heard back from the Warden. *Id.* at 68.

The same day Kalu reported the abuse, he was approached by three guards, handcuffed, removed from the general population, and placed in FCI Allenwood's Special Housing Unit ("SHU"). While in the SHU, Kalu was "stripped naked with no clothes or underwear for thirty minutes in the holding cell" while several guards passed by "laughing." *Id.*

On November 9, 2016, Kalu was questioned by FCI Allenwood's Secret Investigation Services ("SIS") regarding his assault allegations. About five days later, the SIS informed Kalu they had concluded their investigation: Lt. Middernatch "denied the allegation" and the SIS "believed his version of the story." *Id.* at 69. Prison officials then ordered Kalu to return to the general population even though Kalu refused to go back because he was afraid "for his life" and "to face his assailant." *Id.* at 69–70.

Shortly upon his return to the general population, on December 1, 2016, Kalu was sexually assaulted for a third time. Kalu was returning from breakfast at the cafeteria when

he spotted Lt. Middernatch waiting for him past the metal detector. As in the previous occasions, Lt. Middernatch singled out Kalu and pretended to conduct a pat down. During the pat down, Lt. Middernatch grabbed, squeezed, and rubbed Kalu's genitals and said, "You like that." *Id.* at 67. When Kalu did not reply, Lt. Middernatch "forced his fingers into [Kalu's] anus, saying how about this?" *Id.* Kalu reported this latest incident to Warden Spaulding via email.

Following these episodes of sexual assault, Kalu was subjected to further abuse by prison officials. Specifically, Kalu was forced "to sleep on a cold steel metal bunk" in below freezing temperatures for six months. *Id.* at 71. He was also deprived of heat and appropriate clothing during this period.

The incidents of sexual assault caused Kalu to suffer "mental anguish manifesting in daytime flashbacks[,] lapses of concentration, and outbreaks of jitters, varying in intensity from a mild attack of nerves to almost loss of control," and his condition "may have graduated into [] permanent post-traumatic stress disorder." *Id.* at 73. Kalu also experienced reoccurring "nightmares of sexual assault," and his cellmates heard him "cry out in distress during the night." *Id.*

### B.

### 1.

Before filing the present suit, Kalu sought redress through the Bureau of Prisons' ("BOP") Administrative Remedy Program ("ARP"). The BOP's ARP is a three-tiered system whereby a federal inmate may "seek formal review of an issue relating to any aspect of his/her own confinement."

*See* 28 C.F.R. § 542.10(a). Under the BOP's administrative procedures, an inmate must first attempt an informal resolution by "present[ing] an issue of concern informally to staff." *Id.* § 542.13(a). If the inmate is unsuccessful in achieving an informal resolution, he or she may submit a formal written Administrative Remedy Request ("AR" or "Request") to the facility's Warden. *Id.* § 542.14(a). An inmate dissatisfied with the Warden's response may file an administrative appeal with the Regional Director, and subsequently with the BOP's General Counsel. *Id.* § 542.15(a). The BOP's procedures allow certain limited exceptions to the requirement that an inmate file an AR to the Warden. For instance, if an inmate "reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director." *Id.* § 542.14(d)(1). In addition, to comply with Congress's passage of the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301 *et seq.*, the BOP has established specific guidelines to address inmate claims of sexual abuse. *See* 28 C.F.R. § 115.52.

Here, Kalu filed several Requests but was unsuccessful in obtaining relief. On November 28, 2016, Kalu submitted "AR 883971–R1 to the Northeast Regional Office concerning a staff complaint." J.A. 7 (quotation marks and citation omitted). The Request was rejected the next day, and Kalu was advised to resubmit after making certain corrections. On December 3, 2016, Kalu resubmitted AR 883971–R2 which stated the Request concerned "PREA–Sexual Abuse by Staff." *Id.* The Request was rejected on December 9, 2016, for several reasons. Yet "Kalu never filed any administrative remedy at the Central Office level," and he did not file any subsequent resubmissions with the Regional Office. *Id.* at 8.

In addition, on December 1, 2016, Kalu submitted AR 884586–R1 to the Regional Office regarding a staff complaint. The Request was rejected the next day because it was not submitted on the proper form. But "Kalu did not resubmit Administrative Remedy 884586 to the Regional Office." *Id.*

2.

On August 20, 2019, Kalu filed a *pro se* complaint in the Middle District of Pennsylvania against Warden Spaulding and Lt. Middernatch asserting violations of his constitutional rights and seeking damages under *Bivens*, among other relief.[2] Specifically, Kalu alleges: (1) Lt. Middernatch violated Kalu's Eighth Amendment rights when he sexually assaulted him on multiple occasions; (2) both defendants violated Kalu's Eighth Amendment rights when they subjected him to inhumane conditions of confinement; and (3) Warden Spaulding violated Kalu's Eighth Amendment rights when he failed to protect him

---

[2] Kalu's complaint also named Discipline Hearing Officer K. Bittenbender ("DHO K. Bittenbender") as a defendant. Kalu alleged that, after he filed a PREA complaint against Lt. Middernatch, DHO K. Bittenbender imposed retaliatory sanctions against him, in violation of his First Amendment rights. The District Court dismissed the claim against DHO K. Bittenbender because First Amendment retaliation claims are not eligible for *Bivens* remedies. *See Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020). Kalu does not challenge that ruling on appeal.

from sexual assault through deliberate indifference.[3]

On March 16, 2020, defendants filed a combined

---

[3] Kalu's complaint only mentions Warden Spaulding as a defendant with regard to his conditions-of-confinement claim. *See* J.A. 71 ("Defendants K. Middernatch, Lieutenant K. Bittenbender DHO, *Spaulding Warden*, violated Plaintiff Kalu's Eighth Amendment [constitutional] rights to be free from cruel and unusual punishment through sanctions to sleep on a cold steel metal bunk for six months in a 10° degree below freezing special housing unit . . . ." (emphasis added)); *see also id.* ("Defendant K. Middernatch Lieutenant violated Plaintiff Kalu's Eighth Amendment right to be free from cruel and unusual punishment through repetitive sexual assault, and solitary confinement."). On appeal, Kalu argues his complaint also sets forth a deliberate indifference or failure-to-protect claim against Warden Spaulding. *See* Appellant's Br. 18–20 ("As Mr. Kalu explained in his *pro se* brief opposing the government's dismissal motion, [the] sequence of events plausibly illustrates the Warden's deliberate indifference: He knew of a substantial risk of serious harm to Mr. Kalu and yet failed to respond reasonably." (quotation marks omitted)). At the motion to dismiss stage, "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), and this "already liberal standard is even more pronounced where a plaintiff files the complaint without the assistance of counsel," *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quotation marks omitted). For the purpose of this appeal, therefore, we read Kalu's factual allegations as raising either an Eighth Amendment deliberate indifference or failure-to-protect claim against Warden Spaulding.

motion to dismiss and motion for summary judgment which the District Court granted in part and denied in part on March 30, 2021. The District Court dismissed Kalu's claims against Warden Spaulding without prejudice, reasoning that: (1) liability under *Bivens* could not be predicated solely on a theory of respondeat superior; and (2) Kalu had failed to show that Warden Spaulding was personally involved in the alleged constitutional violations to make out a claim against him. *See id.* at 23 ("The complaint's factual allegations regarding Warden Spaulding are insufficient to allege a facially plausible *Bivens* claim that he was personally involved in the violation of Kalu's constitutional rights."). However, the District Court found that Kalu could remedy his failure to allege sufficient personal involvement by amending his pleadings and granted leave to file an amended complaint as to Warden Spaulding. The suit was allowed to proceed on the sexual assault claim against Lt. Middernatch. The District Court did not address the conditions-of-confinement claim.

On July 30, 2021, Kalu filed an amended complaint. On September 12, 2021, defendants filed a second motion to dismiss, and shortly thereafter Kalu voluntarily sought to withdraw the amended complaint. The District Court granted Kalu's motion and denied defendants' motion to dismiss as moot.

On November 29, 2021, Lt. Middernatch filed a third motion to dismiss. The District Court granted the motion on September 23, 2022, disposing of the remaining claims: "(1) a sexual assault claim under the Eighth Amendment; and (2) a condition-of-confinement claim under the Eighth Amendment." *Id.* at 41, 48. The District Court's analysis followed the two-part test set out in *Ziglar v. Abbasi*, 582 U.S. 120 (2017), and emphasized that the "Supreme Court [has]

cautioned against expanding *Bivens* beyond the three established circumstances where it has formally acknowledged the availability of a *Bivens* remedy." J.A. 42 (citing *Abbasi*, 582 U.S. at 135).

Regarding the first claim, the District Court determined that an "alleged sexual assault is a new context under *Bivens*." *Id.* at 45. The District Court acknowledged that both our Court of Appeals and the Supreme Court have "previously established that a federal prisoner has a clearly established constitutional right to have prison officials protect him from inmate violence and provided a remedy when an official violated that right." *Id.* at 45 n.4 (citing *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Shorter v. United States*, 12 F.4th 366, 371–72 (3d Cir. 2021)). But the District Court distinguished those cases on the grounds that Kalu alleged *officer*-on-inmate rather than *inmate*-on-inmate violence. The District Court also found that special factors counseled against extending *Bivens* to this new context: "Congress, in passing the PREA opted not to include a private right for action for damages for inmates." *Id.* at 46. Thus, the District Court declined to "extend the *Bivens* remedy to Eighth Amendment cruel and unusual punishment claims premised on sexual assault," and dismissed Kalu's sexual assault claim against Lt. Middernatch with prejudice. *Id.* at 45; *see also id.* at 49.

The District Court likewise determined that a "conditions of confinement claim is a new context under *Bivens*." *Id.* at 46. The District Court relied on our non-precedential opinion in *Mammana v. Barben*, 856 F. App'x 411 (3d Cir. May 21, 2021), which rejected the argument that *Carlson v. Green*, 446 U.S. 14 (1980), "gives rise to an Eighth Amendment conditions-of-confinement claim against federal

officials." J.A. 46 (citing *Mammana*, 856 F. App'x at 414–15). The District Court then found that two special factors counseled against extending *Bivens* to this new context: (1) the BOP's administrative remedy process is available to address these types of claims; and (2) "Congress's omission of a 'standalone damages remedy against federal jailers' when it passed the Prison Litigation Reform Act post-*Carlson* 'suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.'" *Id.* (quoting *Abbasi*, 582 U.S. at 149). Thus, the District Court declined "to extend the *Bivens* remedy to this context" and dismissed Kalu's conditions-of-confinement claim. *Id.*

On October 11, 2022, Kalu, still *pro se*, filed a timely notice of appeal challenging the dismissal of his three Eighth Amendment claims against Lt. Middernatch and Warden Spaulding.[4]

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 over the District Court's final decisions dismissing the claims in Kalu's complaint.

We review de novo a district court's ruling granting a motion to dismiss. *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

---

[4] Kalu later obtained counsel and has been represented during the proceedings before this Court.

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* We affirm a district court's dismissal only if, "accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not entitled to relief under any reasonable reading of the complaint." *McMullen v. Maple Shade Twp.*, 643 F.3d 96, 98 (3d Cir. 2011) (quotation marks and citation omitted). Because Kalu's complaint was filed *pro se*, we construe it liberally and hold it "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quotation marks and citation omitted); *see also Durham v. Kelley*, 82 F.4th 217, 223 (3d Cir. 2023).

## III.

In certain circumstances, the Constitution affords a cause of action for damages against individual federal officers to redress violations of constitutional rights. *Bivens*, 403 U.S. at 397. "In the case giving the doctrine its name, the Supreme Court held there is a cause of action for damages when a federal agent, acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment." *Shorter*, 12 F.4th at 371 (citing *Bivens*, 403 U.S. at 389, 397). In the decade following *Bivens*, the Supreme Court recognized two additional causes of action under the Constitution: first, for a congressional staffer's gender discrimination claim under the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228, 244 (1979), and second, for a federal

prisoner's inadequate-care claim under the Eighth Amendment, *see Carlson*, 446 U.S. at 19. *Egbert*, 592 U.S. at 490–91.

Since then, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001), and "has not implied additional causes of action under the Constitution," *Egbert*, 592 U.S. at 491. Instead, in recognition that separation of powers principles are central to the analysis, the Court has "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity."[5] *Abbasi*, 582 U.S. at 135 (quoting *Iqbal*, 556 U.S. at 675). At bottom, the "question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). "The answer most often will be Congress," *id.*, as the "Judiciary's authority to do so at all is, at best, uncertain," *Egbert*, 592 U.S. at 491. The Constitution entrusts the legislature—not the courts—with the power to fashion new causes of action. And "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Abbasi*, 582 U.S. at 133. Therefore, when considering whether to recognize a new implied cause of action for damages under a constitutional provision, "our

_____

[5] *See Egbert*, 596 U.S. at 486 (noting that in the four decades since deciding *Bivens*, the Supreme Court has "declined 11 times to imply a similar cause of action for other alleged constitutional violations," and citing cases).

watchword is caution." *Hernandez*, 589 U.S. at 101.

Reflecting these concerns, the Supreme Court has set forth a two-step inquiry to determine the availability of *Bivens* remedies in a particular case. *See Abbasi*, 582 U.S. at 139–40. First, we ask whether the "case presents a new *Bivens* context"—*i.e.*, whether the "case is different in a meaningful way from previous *Bivens* cases decided by" the Supreme Court. *Id.* at 139. Only three cases serve as a benchmark: *Bivens*, *Davis*, and *Carlson*.[6] "And our understanding of a 'new context' is broad." *Hernandez*, 589 U.S. at 102.

While the Court has not outlined "an exhaustive list of differences that are meaningful enough to make a given context a new one," factors to be considered include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the

---

[6] *See Abbasi*, 582 U.S. at 131 ("[T]hree cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *see also Xi v. Haugen*, 68 F.4th 824, 834 (3d Cir. 2023) ("A context may be regarded as new if it is different in any meaningful way from the three contexts where the Court has recognized a *Bivens* remedy . . . ." (quotation marks and citation omitted)).

officer was operating; the risk of
disruptive intrusion by the Judiciary into
the functioning of other branches; or the
presence of potential special factors that
previous *Bivens* cases did not consider.

*Abbasi*, 582 U.S. at 139–40. "If a case does not present a new
*Bivens* context, the inquiry ends there, and a *Bivens* remedy is
available." *Shorter*, 12 F.4th at 372.

Alternatively, if the case presents a new context, we
proceed to the second step of the inquiry and ask whether there
are "special factors counselling hesitation" in extending
*Bivens*. *See Abbasi*, 582 U.S. at 136. The focus at this second
step is "on whether the Judiciary is well suited, absent
congressional action or instruction, to consider and weigh the
costs and benefits of allowing a damages action to proceed."
*Id.* At this stage, two factors are "particularly weighty: the
existence of an alternative remedial structure and separation-
of-powers principles." *Bistrian v. Levi*, 912 F.3d 79, 90 (3d Cir.
2018) (citing *Abbasi*, 582 U.S. at 136). But *any* reason to pause
is sufficient to forestall a *Bivens* extension. *Hernandez*, 589
U.S. at 102.

In the present suit, Kalu claims Lt. Middernatch and
Warden Spaulding violated his Eighth Amendment rights
when: (a) a prison guard sexually assaulted him on several
occasions; (b) prison officials forced him to endure inhumane
conditions of confinement; and (c) the facility's Warden failed
to protect him from sexual assault through deliberate
indifference. After applying *Abbasi*'s two-pronged inquiry, the
District Court dismissed Kalu's first and second claims
because it determined that they presented new *Bivens* contexts,

and special factors counseled against extending *Bivens* liability. The District Court also dismissed Kalu's claims against Warden Spaulding on the ground that Kalu failed to allege sufficient facts showing personal involvement by the Warden to establish a plausible claim against him. We examine each claim in turn.

## A.

Kalu alleges Lt. Middernatch violated his Eighth Amendment rights when he sexually assaulted him on three separate occasions and seeks damages to redress that harm. But Kalu's sexual assault claim is ineligible for remedies under *Bivens* because it arises in a new context and special factors counsel against extending *Bivens* to this set of facts.

## 1.

The first step of the *Bivens* framework requires us to ask whether a case presents a new context. *See Egbert*, 596 U.S. at 492. Applying that inquiry here, Kalu's Eighth Amendment sexual assault claim presents a new context because it "is different in a meaningful way from previous *Bivens* cases decided by" the Supreme Court. *Abbasi*, 582 U.S. at 139.

As a threshold matter, Kalu's claim is "meaningfully different" from those in *Bivens* and *Davis* because it arises under a different constitutional provision and involves a different category of defendants. *Hernandez*, 589 U.S. at 103; *see also Abbasi*, 582 U.S. at 139–40 ("A case might differ in a meaningful way because of the rank of the officers involved [or] the constitutional right at issue . . . ."). Kalu's claim must therefore be sufficiently similar to the Supreme Court's only

Eighth Amendment *Bivens* precedent, *Carlson v. Green*, 446 U.S. 14 (1980), to qualify for *Bivens* remedies.

Like the plaintiff in *Carlson*, Kalu invokes the Eighth Amendment in the prison setting against federal prison officials. *Carlson*, 446 U.S. at 16. But those factual parallels are not dispositive. *Hernandez* tells us that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." 598 U.S. at 103. And *Egbert* instructs us that "almost parallel circumstances" are not sufficient. 596 U.S. at 495 (quoting *Abbasi*, 582 U.S. at 139). "[H]ere, distinctions abound," *Xi*, 68 F.4th at 834, and several factors render Kalu's claim meaningfully different from that in *Carlson*.

*First*, Kalu's claim concerns a different kind of officer misconduct. *See Abbasi*, 582 U.S. at 140 (listing "the generality or specificity of the official action" as a factor in the first step of the analysis). *Carlson* involved a claim against federal prison officers for failure to provide adequate medical treatment leading to a prisoner's death. *See* 446 U.S. at 16 n.1. Kalu, by contrast, alleges that a prison guard sexually assaulted him on three separate occasions. While the official action in both cases caused harm to the prisoners, "the mechanism of injury" and the nature of the official misconduct is sufficiently different to render Kalu's claim a modest extension of *Carlson*. *Abbasi*, 582 U.S. at 139. And under the Supreme Court's precedent, "even a modest extension is still an extension." *Id.* at 148.

*Second*, Kalu's claim presents "features that were not considered" by the Supreme Court when deciding *Carlson*. *Id.*

at 148; *see also id.* at 140 (listing "the presence of potential special factors that previous *Bivens* cases did not consider" as a relevant factor in the new context inquiry). In *Carlson*, the plaintiff—the administratrix of the estate of her deceased son—did not have an alternative remedy against the officials alleged to have acted unconstitutionally. *Carlson*, 446 U.S. at 20. As with *Bivens* and *Davis*, *Carlson* was a case of "damages or nothing." *Bivens*, 503 U.S. at 410 (Harlan, J., concurring in judgment). Since *Carlson* was decided prior to the passage of the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. §§ 1997e *et seq.*, federal prisoners seeking money damages for "constitutional claims had no obligation to exhaust administrative remedies." *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). And, at the time, the BOP's remedy program was not in existence.[7] Thus, in *Carlson*, there was "no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment [could] not recover money damages from the agents but [had to] be remitted to another remedy, equally effective in the view of Congress." *Carlson*, 446 U.S. at 19. That situation bears little resemblance to Kalu's case where Congress, through the PLRA, has enacted legislation to address prisoners' lawsuits, and where the BOP's ARP provides inmates with an alternative avenue for relief.[8] Because the PLRA and the BOP's remedy

_____

[7] The BOP's ARP was established in 1996, after the passage of the PLRA. *See* 61 Fed. Reg. 86 (Jan. 2, 1996) (codified at 28 C.F.R. § 542) (publishing the revised regulations which created the current version of the BOP's administrative program).

[8] That the political branches have provided an alternative avenue to redress prisoner claims is a factor of heightened importance. For decades, the Supreme Court instructed that a

program are "features that were not considered" by the Supreme Court when it decided *Carlson*, they present an additional reason to conclude that Kalu's claim arises in a new context. *Abbasi*, 582 U.S. at 148.

*Third*, Kalu's claim involves an increased "risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 582 U.S. at 140. In *Carlson*, the Court considered a narrow claim that raised well-established criteria for liability: "a claim for inadequate prison medical care brought under the Eighth Amendment's Cruel and Unusual Punishment Clause." *Xi*, 68 F.4th at 832 (citation omitted). Although *Carlson* approved some encroachment into the functioning of federal prisons, Kalu's claim threatens to interfere with federal prison operations "in ways *Carlson* did not contemplate." *Sargeant v. Barfield*, 87 F.4th 358, 367 (7th Cir. 2023) (declining to extend *Bivens* to an Eighth Amendment failure-to-protect claim brought by a federal prisoner). Permitting Kalu's claim to proceed would invite judicial intrusion into a different aspect of federal prison

---

*Bivens* cause of action may be defeated "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson*, 446 U.S. at 18–19. But after *Egbert*, we "may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Egbert*, 596 U.S. at 493 (quoting *Abbasi*, 582 U.S. at 137). And today it no longer "matter[s] that 'existing remedies do not provide *complete relief*.'" *Id.* (emphasis added) (quoting *Bush*, 462 U.S. at 388).

administration: staffing and discipline instead of medical care. And recognizing a cause of action for officer-on-inmate sexual abuse would invariably implicate a broad range of potential officer misconduct and sensitive line-drawing considerations that courts are ill-positioned to assess. *See Abbasi*, 582 U.S. at 136 ("[T]he decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide."). The heightened risk of intrusive judicial inquiry into an area that has been committed to the responsibility of the political branches, *see Turner v. Safley*, 482 U.S. 78, 85 (1987), distinguishes this case from *Carlson* and provides another reason to conclude that it presents a new *Bivens* context.

Kalu argues his Eighth Amendment sexual assault claim against Lt. Middernatch does not present a new *Bivens* context because it is not meaningfully different from the Supreme Court's opinion in *Farmer v. Brennan*, 511 U.S. 825 (1994). But his reliance on *Farmer* is misplaced for a number of reasons. As an initial matter, *Farmer* did not address the propriety of *Bivens* remedies. Rather, the case asked the Court to define the deliberate indifference standard for Eighth Amendment claims. *Farmer*, 511 U.S. at 828. In *Farmer*, the Court considered a prisoner's claim against federal prison officials for their failure to prevent inmate-on-inmate sexual violence, *id.* at 830–31, and held that a prison official could be liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it," *id.* at 847. The Court remanded for further proceedings without indicating whether it was recognizing a new cause of action under *Bivens* for such claims. *See Sargeant*, 87 F.4th at 364–65 (discussing *Farmer*, 511 U.S. at 830; 835–40). And the parties "neither briefed nor

discussed at oral argument whether the case was properly a *Bivens* case." *Id.* at 365 n.2.

Additionally, the Supreme Court has never recognized *Farmer* as a *Bivens* case. In the decades since *Farmer*, the Court has repeatedly omitted it from lists of its *Bivens* jurisprudence. *See, e.g.*, *Egbert*, 596 U.S. at 490–91 (discussing *Bivens*, *Davis*, and *Carlson*, and noting that "[s]ince these cases, the Court has not implied additional causes of action under the Constitution"); *Hernandez*, 589 U.S. at 99 ("*Bivens*, *Davis*, and *Carlson* were the products of an era when the Court routinely inferred causes of action that were not explicit in the text of the provision that was allegedly violated." (quotation marks and citation omitted)); *Abbasi*, 582 U.S. at 131 ("These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *Minneci v. Pollard*, 565 U.S. 118, 124 (2012) ("Since *Carlson*, the Court has had to decide in several different instances whether to imply a *Bivens* action. And in each instance it has decided against the existence of such an action."); *Malesko*, 534 U.S. at 70 ("In 30 years of *Bivens* jurisprudence we have extended its holding only twice . . . .").

Furthermore, the Supreme Court has cautioned against implying a *Bivens* remedy where an earlier opinion has assumed without deciding otherwise. *Sargeant*, 87 F.4th at 365 (citations omitted). In *Egbert*, the Court considered a First Amendment retaliation claim and noted that while it had previously "assumed that such a damages action might be available," it had "never held that *Bivens* extends to First Amendment claims." 596 U.S. at 498 (quotation marks, citations, and alterations omitted). After applying the two-step

inquiry required by its precedent, the Court concluded such claims were ineligible for *Bivens* remedies. *Id.* at 498–99. *Egbert*'s reasoning applies equally here: an assumption in *Farmer* should not be interpreted as affirmatively authorizing a *Bivens* action in that setting. For these reasons, we find that *Farmer* does not present an established *Bivens* context.[9]

Kalu next argues two of our prior *Bivens* cases compel a different outcome. Specifically, he contends our decisions in *Bistrian* and *Shorter* establish that "no new *Bivens* context is presented when prison officials are responsible for the assault of an inmate in their care," and those decisions should control the new context analysis here. Appellant's Br. 28. But Kalu's

---

[9] We note that Courts of Appeals have varied on the issue of whether *Farmer* recognized a new *Bivens* cause of action. *Compare Bistrian*, 912 F.3d at 90–91 ("It seems clear, then, that [in *Farmer*] the Supreme Court [], pursuant to *Bivens*, recognized a failure-to-protect claim under the Eighth Amendment."), *with Bulger v. Hurwitz*, 62 F.4th 127, 139 (4th Cir. 2023) ("Appellant's theory that *Farmer* recognized a fourth context of *Bivens* claims beyond the issues presented in *Bivens*, *Davis*, and *Carlson* is contrary to the Supreme Court's recognition that it has refused to extend *Bivens* to any new context for the past 30 years, which includes the time period it decided *Farmer*." (quotation marks and citation omitted)), *Sargeant*, 87 F.4th at 365 ("Not once has the Supreme Court mentioned *Farmer* alongside [*Bivens*, *Davis*, and *Carlson*], and we think it would have if *Farmer* created a new context or clarified the scope of an existing one."), *and Chambers v. Herrera*, 78 F.4th 1100, 1105 n.2 (9th Cir. 2023) (declining to recognize *Farmer* as a *Bivens* case).

argument ignores *Abbasi*'s instruction that "lower courts [can] no longer rely on their own prior precedents" to determine whether a case presents a novel context for *Bivens* purposes. *Mack*, 968 F.3d at 319; *see also Abbasi*, 582 U.S. at 139. After *Abbasi*, we may only use three cases as benchmarks: *Bivens*, *Davis*, and *Carlson*.[10] Besides, both *Bistrian* and *Shorter*

---

[10] In *Abbasi*, decided in 2017, the Supreme Court expressly indicated that "three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Abbasi*, 582 U.S. at 131. *Hernandez*, issued in 2020, restated that the Court has only authorized an implied cause of action in "three *Bivens* cases"—specifically *Bivens*, *Davis*, and *Carlson*—and only those can be considered in the new context inquiry. *See Hernandez*, 589 U.S. at 101–02; *see also id.* at 117 (Thomas, J., concurring) ("[The Court has] effectively cabined the *Bivens* doctrine to the facts of *Bivens*, *Davis*, and *Carlson*.").

Despite that assertion, our *Bivens* case law has relied on *Farmer v. Brennan* as a benchmark in the new context inquiry. In *Shorter v. United States*, decided a year after *Hernandez*, we explained that "the Supreme Court in *Abbasi* [and *Hernandez*] neglected to name *Farmer* because it saw that case as falling under the umbrella of *Carlson*." *Shorter*, 12 F.4th at 373 n.5. In other words, we interpreted *Farmer* as falling within the scope, or stretching the bounds of, the context recognized in *Carlson*.

But more recently, in *Egbert*, the Supreme Court *again* reiterated that at the first step of the analysis "we ask whether the case presents a new *Bivens* context—*i.e.*, is it meaningfully different from the *three* cases in which the Court has implied a

damages action." *Egbert*, 596 U.S. at 492 (emphasis added) (quotation marks, citation, and alterations omitted). And the Court went as far as suggesting "that any extension to a new context may be *ultra vires*." *Xi*, 68 F.4th at 833; *see also Egbert*, 596 U.S. at 502 ("[W]e have indicated that if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution.").

*Hernandez* and *Egbert* evince the Court's new appreciation of "'the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Egbert*, 596 U.S. at 491 (quoting *Hernandez*, 589 U.S. at 100); *see also id.* at 504 (Gorsuch, J., concurring in the judgment) ("[I]f the only question is whether a court is 'better equipped' than Congress to weigh the value of a new cause of action, surely the right answer will always be no. Doubtless, these are the lessons the Court seeks to convey. I would only take the next step and acknowledge explicitly what the Court leaves barely implicit."). Given the changing "judicial attitudes about the creation of new causes of action," *Vanderklok v. United States*, 868 F.3d 189, 200 (3d Cir. 2017), and *Abbasi*, *Hernandez*, and *Egbert*'s continued omission of *Farmer* from the list of Supreme Court cases recognizing a cause of action under the Constitution, we believe that *Farmer* is not an appropriate benchmark in the new context inquiry. We therefore follow the Supreme Court's guidance and compare the facts of Kalu's case against *Bivens*, *Davis*, and *Carlson* only. This finding is consistent with our more recent precedent declining to read *Farmer* as an established *Bivens* context. *See Dongarra v. Smith*, 27 F.4th 174, 180 (3d Cir. 2022) ("[T]he Court has recognized these implied causes of actions for constitutional violations in only three contexts:

involved officers who failed to protect prisoners from *inmate*-on-inmate sexual assault, whereas Kalu alleges *officer*-on-inmate sexual assault.[11] *See Bistrian*, 912 F.3d at 83, 88 (finding that an inmate's claim that prison officials failed to protect him from "prisoner-on-prisoner violence is not a new context for *Bivens* claims"); *Shorter*, 12 F.4th at 369, 373 (holding that an inmate's claim that prison "officials violated her Eighth Amendment rights by displaying deliberate indifference to the substantial risk that another inmate would [sexually] assault her" does not present a novel *Bivens* context). While this difference may appear to some to be a minor one, it furnishes a basis to hold that Kalu's case seeks to extend the *Bivens* remedy. And all that is needed to forestall a *Bivens* extension is "*any* rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of

---

*Bivens*; *Davis v. Passman*; and *Carlson*."); *see also Xi*, 68 F.4th at 833 (identifying *Bivens*, *Davis*, and *Carlson* as the three cases where the Supreme Court has implied a damages action under the Constitution).

[11] At oral argument, Kalu's counsel agreed there is a difference between *inmate*-on-inmate violence and *officer*-on-inmate assault for purposes of the *Bivens* analysis. *See* Arg. Tr. 9:3–9:7. However, counsel argued the difference was not dispositive: the distinction would not "expand or extend *Bivens* because it's a distinction that only makes the offense more egregious." Arg. Tr. 9:3–9:7; *see also* Appellant's Br. 26 ("Mr. Kalu's sexual assault claim does not meaningfully extend *Bivens* because it is grounded in—and involves an even starker violation of—the same Eighth Amendment right that animated *Farmer* in the same context of prison sexual assault."). We address that argument below.

allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 496 (quoting *Abbasi*, 582 U.S. at 136). Thus, Kalu's reliance on *Bistrian* and *Shorter* is unpersuasive.

Finally, Kalu argues his claim does not present a new context because it would not "extend[]," *Egbert*, 596 U.S. at 494, or "expand[]," *Abbasi*, 582 U.S. at 135, the existing level of constitutional protection. He contends it "would be odd indeed if *Bivens* relief were available when a prison official is deliberately indifferent to the risk of sexual assault by other inmates, but not when that same prison official perpetrates the sexual assault himself" because the latter conduct "is inherently *more egregious*." Appellant's Reply Br. 17. But that argument "misses the point," *Hernandez*, 589 U.S. at 108, as it misapplies the new context inquiry. *Bivens* is concerned with "deterring the unconstitutional acts of individual officers," *Malesko*, 534 U.S. at 71, and "respect for the separation of powers" is our guiding principle, *Hernandez*, 589 U.S. at 113. Our analysis in *Bivens* cases is not focused on the seriousness or egregiousness of a defendant's conduct—we do not ask whether the defendant's conduct violated an individual's right. "Instead, we ask whether the Judiciary should alter the framework established by the political branches for addressing any such conduct that allegedly violates the Constitution." *Egbert*, 596 U.S. at 500 (quotation marks and citation omitted). And, where, as here,[12] there are reasons to think that "Congress

---

[12] As discussed *infra*, the existence of an alternative remedial scheme through the BOP's ARP, Congress's omission of a standalone damages action in the PLRA and PREA, and Congress's extensive regulation of the problem of sexual abuse in prisons through the PREA are "reasons to think [the political branches] might doubt the efficacy or necessity of a damages

or the Executive has created a remedial process that it finds
sufficient to secure an adequate level of deterrence" for a
certain class of federal officials, we "cannot second-guess that
calibration by superimposing a *Bivens* remedy." *Id.* at 489. In
other words, the seriousness of a federal official's misconduct
does not authorize us to change the remedies available against
that class of defendants.[13] *See id.* at 496 ("The *Bivens* inquiry
does not invite federal courts to independently assess the costs
and benefits of implying a cause of action.").

The distinctions between Kalu's sexual assault claim
and the one recognized in *Carlson* "are perhaps small, at least

---

remedy" in the context of federal prison. *Abbasi*, 582 U.S. at
137.

[13] Of note, in *Abbasi* the Court observed that, in *Bivens* cases,
there "is a persisting concern . . . that absent a *Bivens* remedy
there will be insufficient deterrence to prevent officers from
violating the Constitution." *Abbasi*, 582 U.S. at 145. But the
Court instructed that such concern must be balanced against
the costs and burdens that would be imposed on the
Government. *Id.* Officers "who face personal liability for
damages might refrain" in performing their duties, and "the
costs and difficulties of later litigation might intrude upon and
interfere with the proper exercise of their office." *Id.* And
"Congress is 'far more competent than the Judiciary' to weigh
such policy considerations." *Egbert*, 596 U.S. at 491 (quoting
*Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)). Thus, we
"should not inquire . . . whether *Bivens* relief is appropriate in
light of the balance of circumstances in the 'particular case.'"
*Id.* at 496 (quoting *United States v. Stanley*, 483 U.S. 669, 683
(1987)).

in practical terms." *Abbasi*, 582 U.S. at 149. But given the Supreme Court's "expressed caution about extending the *Bivens* remedy," the new-context inquiry is easily satisfied here. *Id.*

2.

The next step of the framework requires us to determine whether a case presents special factors that counsel hesitation in extending the *Bivens* remedy. *See Abbasi*, 582 U.S. at 149. Several special factors weigh against extending *Bivens* liability to Kalu's Eighth Amendment sexual assault claim, especially because it arises in the prison setting.

*First*, the availability of alternative remedies weighs against allowing *Bivens* remedies here. Inmates in Kalu's position have full access to an alternative remedial mechanism established by the Executive Branch: the BOP's ARP. *See Malesko*, 534 U.S. at 74. The BOP's program and procedures allow "all inmates in institutions operated by the Bureau of Prisons," 28 C.F.R. § 542.10(b), "to seek formal review of an issue relating to any aspect of his/her own confinement," *id.* § 542.10(a). The program provides "an alternative remedial structure," *Abbasi*, 582 U.S. at 137, as it is "another means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring," *Malesko*, 534 U.S. at 74. In fact, the BOP's administrative procedures under the Prison Rape Elimination Act set forth specific provisions regarding the resolution of federal prisoners' sexual abuse claims. *See* 28 C.F.R. § 115.52 (describing administrative procedures to address an inmate's claim of sexual abuse, including grievances regarding "a staff member who is the subject of the complaint").

The presence of an alternative remedial structure through the BOP's program is sufficient by itself to preclude an extension of *Bivens*. The Supreme Court's "cases hold that a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Egbert*, 596 U.S. at 493 (quoting *Abbasi*, 582 U.S. at 137). "For if Congress has created 'any alternative, existing process for protecting the injured party's interest' that itself may 'amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Abbasi*, 582 U.S. at 137 (alterations omitted) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). And this is true regardless of whether alternative remedies are "not as effective as an individual damages remedy." *Bush*, 462 U.S. at 372.[14]

*Second*, congressional silence in this particular context indicates that Congress did not want to create a damages remedy against federal prison officials. Congress has passed legislation in this subject area addressing both the issue of prisoners' constitutional claims through the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. §§ 1997e *et seq.*, and the issue of sexual abuse in federal prisons through the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. §§ 30301 *et seq.* Both times, the resulting legislation has explicitly omitted an individual capacity damages cause of

---

[14] "The fact that [Kalu] was unsuccessful in obtaining relief through [the BOP's] program does not mean that he did not have access to alternative or meaningful remedies." *Mack*, 968 F.3d at 321 n.8 (quotation marks and citation omitted).

action against federal officials. "This pattern of congressional action—refraining from authorizing damages actions for injury inflicted" by federal prison officials—"gives us further reason to hesitate about extending *Bivens* in this case." *Hernandez*, 589 U.S. at 113.

Allowing Kalu's claim to proceed would conflict with Congress's stated purpose in passing the PLRA—namely, to "eliminate unwarranted federal-court interference with the administration of prisons." *Woodford*, 548 U.S. at 93. Enacted some 15 years after *Carlson* was decided, the PLRA "made comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Abbasi*, 582 U.S. at 148. The Act created a mandatory exhaustion provision for cases brought by inmates "with respect to prison conditions," whether under Section 1983 "or any other Federal law." 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002). But the Act itself failed to "provide for a standalone damages remedy against federal jailers," which "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 582 U.S. at 149.

Years later, Congress passed the PREA to, *inter alia*, "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States" and "develop and implement national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30302(1), (3). While the Act established several mechanisms to tackle the issue of sexual abuse in prisons, it did not create a cause of action against federal prison officials. Instead, Congress chose to address the problem by instructing the Attorney General to develop and promulgate "national standards for the detection, prevention, reduction, and

punishment of prison rape," *id.* § 30307(a)(1), and through other measures. *See, e.g.*, *id.* § 30303(a)(1) (directing the Bureau of Justice Statistics to develop a yearly "comprehensive statistical review and analysis of the incidence and effects of prison rape"); *id.* § 30304(a)(2) (requiring the National Institute of Corrections to "conduct periodic training and education programs for Federal, State, and local authorities responsible for the prevention, investigation, and punishment of instances of prison rape"); *id.* § 30305(a) (authorizing grants "to provide funds for personnel, training, technical assistance, data collection, and equipment to prevent and prosecute prisoner rape"); *id.* § 30306(a)–(f) (establishing "a commission to be known as the National Prison Rape Elimination Commission" to provide, among other things, "recommended national standards for enhancing the detection, prevention, reduction, and punishment of prison rape"). Recognizing a cause of action against federal correction officials may threaten to interfere with the comprehensive remedial mechanism established by Congress to address the problem of sexual assault in prisons. *See Bush*, 462 U.S. at 388 ("The question is . . . whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue."). Bearing in mind that separation of powers principles are central to the analysis, *Abbasi*, 582 U.S. at 149, we are hesitant to create such a remedy in this context.

Kalu counters that Congress's silence in the PLRA is not indicative of its desire to limit *Bivens* actions in the prison context and is therefore not a special factor counseling hesitation. *See* Appellant's Br. 44. According to him, "because the PLRA regulates how *Bivens* actions are brought, it cannot

rightly be seen as dictating that a *Bivens* cause of action should not exist at all." *Id.* (quotation marks and citation omitted). Contrary to Kalu's argument, that the statute has been interpreted to govern the process by which prisoners bring *Bivens* claims, *Nyhuis v. Reno*, 204 F.3d 65, 68–69 (3d Cir. 2000), is not dispositive. The PLRA was enacted against the backdrop of *Carlson*, where the Supreme Court extended *Bivens* to an Eighth Amendment claim against prison officials for their failure to provide adequate medical care. *Carlson*, 446 U.S. at 19–18. And in the Act Congress chose to impose the same gatekeeping requirements to the constitutional cause of action recognized in *Carlson* as to claims brought under Section 1983. *See* 42 U.S.C.A. § 1997e(a) (noting that the PLRA applies to actions brought under 42 U.S.C. § 1983 and under "any other Federal law"). It is not surprising Congress elected to institute the same exhaustion provisions to both kinds of cases. "The PLRA was plainly intended, at least in part, to reduce the intervention of federal courts into the management of the nation's prison systems," and "Congress would only undermine this objective by carving out certain types of actions from the aegis of the PLRA." *Booth v. Churner*, 206 F.3d 289, 295 (3d Cir. 2000) (quotation marks and citation omitted), *aff'd*, 532 U.S. 731 (2001). But nothing in Kalu's submissions—or in the PLRA's legislative history— suggests Congress intended the statute to create a *new* cause of action for all constitutional claims brought by federal prisoners. *See Nussle*, 534 U.S. at 523–26 (recounting legislative history); *Alexander v. Hawk*, 159 F.3d 1321, 1324–25 (11th Cir. 1998) (same). The PLRA does not demonstrate legislative intent to provide for a damages remedy in contexts other than the one identified in *Carlson*—it does not suggest Congress wanted to extend the *Bivens* remedy to all

constitutional claims brought by prisoners.[15]

---

[15] In support of his argument, Kalu cites our decisions in *Bistrian v. Levi* and *Mack v. Yost*. *See Bistrian*, 912 F.3d at 93 ("The very statute that regulates how *Bivens* actions are brought cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all."); *Mack*, 968 F.3d at 324 ("We again reject the argument that Congressional silence within the PLRA suggests that Congress did not want a damages remedy against prison officials for constitutional violations."). But another recent decision from our Court reached a contrary determination, reasoning that the PLRA's omission of a cause of action is a special factor counseling hesitation in extending *Bivens*. In *Davis v. Samuels* we stated that "Congress's post-*Bivens* promulgation of the Prison Litigation Reform Act of 1995" was a special factor militating against extending *Bivens* in the prison setting. *See* 962 F.3d 105, 112 (3d Cir. 2020). And several of our sister circuits have agreed with our reasoning in *Samuels* and concluded the PLRA is indicative of legislative intent and thus a special factor counseling hesitation. *See Sargeant*, 87 F.4th at 368 ("[The PLRA is a] reason suggest[ing] that Congress is better positioned to assess the need for a remedy or that Congress might not desire a new remedy."); *Butler v. Porter*, 999 F.3d 287, 294–95 (5th Cir. 2021) (listing the PLRA as a special factor counseling hesitation); *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 524 (6th Cir. 2020) (concluding the PLRA is a special factor because "'[l]egislative action suggesting that Congress does not want a damages remedy' counsels against judicial do-it-yourself projects'" (quoting *Abbasi*, 582 U.S. at 148)).

Of importance, the Supreme Court has provided guidance on the significance of the PLRA in the special factor

Similarly, Kalu argues that the PREA's omission of a damages action is not indicative of legislative intent to foreclose a *Bivens* remedy in the prison context. Specifically, he contends that in passing the PREA "Congress signaled that constitutional tort litigation and *Bivens* remedies in particular were among the measures that would advance the statute's 'zero-tolerance' policy for sexual assault in prisons." Appellant's Br. 35 (quoting 34 U.S.C. § 30302(1)). But contrary to his suggestion, the Act does not purport to manifest congressional *approval* of *Bivens* actions in the prisoner abuse context. The "Findings" section of the statute cites the Supreme Court's opinion in *Farmer v. Brennan* for the proposition that "deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment." 34 U.S.C. § 30301(13). But nothing in the statutory scheme or its language illustrates Congress's intention to create a cause of action for such violations, or to extend *Bivens* remedies to

---

analysis. In *Abbasi*, the Court interpreted the PLRA's omission of a cause of action for damages and noted it may suggest "Congress chose not to extend the *Carlson* damages remedy" to other prisoner cases. *Abbasi*, 582 U.S. at 149. And, in *Egbert*, the Court explained that we now "defer to 'congressional inaction' if 'the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms.'" *Egbert*, 596 U.S. at 501 (quoting *Schweiker*, 487 U.S. at 423). Considering our conflicting precedent and the Court's instruction in *Abbasi* and *Egbert*, we believe Congress's silence in the PLRA constitutes a special factor counseling hesitation in extending *Bivens* liability to this setting.

officer-on-prisoner abuse.

"[T]he concept of special factors counselling hesitation in the absence of affirmative action by Congress has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Schweiker*, 487 U.S. at 423 (quotation marks and citation omitted). So here, the omission of a cause of action for damages against federal officers in the PREA is indicative "that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of [a government program's] administration." *Id.* Given that Congress paid close attention to the issue of sexual assault in prisons but chose not to create a standalone cause of action against federal officials, we decline to supplement the PREA's comprehensive legislative scheme by implying a judicially created *Bivens* remedy.

*Third*, separation of powers principles caution against extending *Bivens* to the novel context presented by Kalu's claim. *Hernandez*, 589 U.S. at 96. When evaluating this factor, we "consider the risk of interfering with the authority of the other branches, and we ask whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, and whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Hernandez*, 589 U.S. at 102 (quotation marks and citations omitted). Here, the fact that Kalu's claim arises in the prison setting is of central importance. The Supreme Court has long recognized that, because "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches," separation of powers and

federalism concerns support conferring "wide-ranging deference" to prison administrators' policy and operational decisions. *Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979); *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984) ("reaffirm[ing] the very limited role that courts should play in the administration of detention facilities"). Since we are unable to anticipate the practical effects of recognizing a damages action against federal officials for officer-on-prisoner assault, we "must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Abbasi*, 582 U.S. at 137.

***

In sum, the availability of an alternative remedial scheme through the BOP's ARP, Congress's repeated omission of a cause of action against individual officials in both the PLRA and PREA, and separation of powers principles are special factors counseling against extending *Bivens* liability to Kalu's officer-on-prisoner sexual assault claim. As *Egbert* cautions, whether to supplement an existing remedial scheme with a damages action is a legislative determination that we are not allowed to "second-guess." *Egbert*, 596 U.S. at 498; *see also id.* at 502 (Gorsuch, J., concurring in the judgment) ("Our Constitution's separation of powers prohibits federal courts from assuming legislative authority."). We therefore hold Kalu's Eighth Amendment sexual assault claim against Lt. Middernatch is ineligible for remedies under *Bivens*. We will affirm the District Court's dismissal of Kalu's sexual assault claim.

B.

Kalu alleges both defendants violated his Eighth Amendment rights when they subjected him to inhumane conditions of confinement. He seeks damages under *Bivens* to redress that harm. But, like his sexual assault claim, Kalu's conditions-of-confinement claim fails because it presents a new *Bivens* context and special factors counsel against a *Bivens* extension.

1.

In his complaint, Kalu argues that he is entitled to damages under *Bivens* to remedy a violation of his Eighth Amendment "rights to be free from cruel and unusual punishment through sanctions to sleep on a cold steel metal bunk for six months" in below freezing temperatures without access to heat or appropriate clothing. J.A. 71. He maintains his conditions-of-confinement claim does not present a novel *Bivens* context because it fits well within the *Bivens* actions recognized by the Supreme Court in *Carlson* and *Farmer*,[16] and the District Court erred in concluding otherwise. We disagree.

In essence, Kalu argues that the Supreme Court's holding in *Carlson* extends to all Eighth Amendment suits brought by federal inmates regarding prison conditions. This argument disregards the Supreme Court's "expressed caution about extending the *Bivens* remedy," and its instruction that

---

[16] As previously discussed, we believe *Farmer* is not an appropriate benchmark in the new context inquiry.

"the new-context inquiry is easily satisfied." *Abbasi*, 582 U.S. at 149. Under the Court's jurisprudence, a novel context may arise if "even one" distinguishing factor implicates separation of powers concerns. *Egbert*, 596 U.S. at 496. That threshold is met here. Kalu's Eighth Amendment conditions-of-confinement claim "bear[s] little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Abbasi*, 582 U.S. at 140 (citing *Bivens*, 403 U.S. at 397; *Davis*, 442 U.S. at 248; and *Carlson*, 446 U.S. at 19).

Kalu's claim presents a new context because it is distinct "in a meaningful way from previous *Bivens* cases decided by" the Supreme Court: *Bivens*, *Davis*, and *Carlson*. *Id.* at 139. As an initial matter, Kalu cannot rely on *Bivens* or *Davis* as comparisons for the new context inquiry—his claim involves a different "category of defendants," *Malesko*, 534 U.S. at 68, and a different constitutional right, *Egbert*, 596 U.S. at 499.

Kalu's claim is also meaningfully different to the one recognized in *Carlson*. Though Kalu's case and *Carlson* present somewhat "parallel circumstances," *Abbasi*, 582 U.S. at 139, as they both involve misconduct by federal prison officials which harmed inmates, the similarities end there. The "theory of liability," *Malesko*, 534 U.S. at 73, and "the mechanism of injury," *Abbasi*, 582 U.S. at 138, are sufficiently distinct to conclude Kalu's case presents a novel *Bivens* context. *See Abbasi*, 582 U.S. at 138–39 (distinguishing *Carlson* from its subsequent decision in *Malesko* even though

the cases presented "almost parallel circumstances," the same "right at issue," and an identical "mechanism of injury"). In Kalu's case, he was forced to endure inhumane conditions of confinement by being forced to sleep in a cold metal bunk and denied appropriate heat and clothing during the winter. In *Carlson*, by contrast, federal prison officials failed to provide medical treatment for a period of hours eventually leading to the prisoner's death. *Carlson*, 446 U.S. at 16 n.1.; *see also Abbasi*, 582 U.S. at 139–40 ("A case might differ in a meaningful way because of . . . the generality or specificity of the official action . . . .").

In addition, as compared to *Carlson*, Kalu's claim "concern[s] a different breed of law enforcement misconduct." *Xi*, 68 F.4th at 834. This factor is material because it increases the "risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 582 U.S. at 140. Specifically, allowing Kalu's claim to proceed would "expand prison officials' liability from previous *Bivens* actions to systemic levels, potentially affecting not only the scope of their responsibilities and duties but also their administrative and economic decisions." *Tate v. Harmon*, 54 F.4th 839, 846 (4th Cir. 2022) (declining to extend *Bivens* to a conditions-of-confinement claim). The potential "impact on governmental [prison] operations systemwide," *Abbasi*, 582 U.S. at 136, coupled with our "policy of judicial restraint" in the realm of prison administration, *Turner*, 482 U.S. at 85, provide yet further reasons to conclude that Kalu's claim presents a novel *Bivens* context.

Finally, the official conduct that Kalu challenges is far broader in scope than that in *Carlson*. Recognizing *Bivens* liability for Kalu's conditions-of-confinement claim could

invite a wide variety of new prisoner suits. And such cases could involve "prison conditions that could vary from cell to cell, from prison to prison, and from time to time, implicating a broad class of inmates suffering ill-defined injuries with ill-defined damages." *Tate*, 54 F.4th at 847. Our inability to "predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*" for this set of facts, therefore, results in uncertainty which alone "forecloses relief." *Egbert*, 596 U.S. at 493 (citing *Abbasi*, 582 U.S. at 136).

When determining whether a case presents a new context for *Bivens* purposes, we must be mindful that the "Constitution's separation of powers requires us to exercise caution before extending *Bivens*." *Hernandez*, 589 U.S. at 96. Caution is especially warranted here. Unlike any previously recognized *Bivens* claim, one based on the conditions of a prison cell implicates policy and operational decisions of prison administrators that raises significant separation of powers concerns. We therefore hold that Kalu's Eighth Amendment conditions-of-confinement claim presents a novel *Bivens* context.

## 2.

The special factors counseling against extending *Bivens* liability to Kalu's sexual assault claim apply equally to Kalu's conditions-of-confinement claim. *First*, as previously discussed, the "Supreme Court has noted that 'when alternative methods of relief are available, a *Bivens* remedy usually is not.'" *Mack*, 968 F.3d at 320 (quoting *Abbasi*, 582 U.S. at 145). Of heightened relevance here, the Supreme Court in *Malesko* "explained that *Bivens* relief was unavailable because federal prisoners could, among other options, file grievances through"

the BOP's Administrative Remedy Program. *Egbert*, 596 U.S. at 497 (citing *Malesko*, 534 U.S. at 74). *Malesko*'s reasoning applies equally here. A plaintiff in Kalu's shoes can—and *must*—seek redress for similar allegedly unconstitutional conditions of confinement through the BOP's ARP. *See Nussle*, 534 U.S. at 532 (holding that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"); *see also Jones v. Bock*, 549 U.S. 199, 218 (2007) (noting that rules "are defined not by the PLRA, but by the prison grievance process itself"); 28 C.F.R. § 542.10(a). Thus, the political branches have "provided alternative remedies for aggrieved parties in [Kalu's] position that independently foreclose a *Bivens* action here." *Egbert*, 596 U.S. at 497.

*Second*, where "Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*, respect for the separation of powers demands that courts hesitate to imply a remedy." *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014). After *Bivens* and *Carlson* were decided, Congress passed the PLRA and had a "specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." *Abbasi*, 582 U.S. at 148. Congress's "dominant concern" in enacting the PLRA was "to promote administrative redress" and "filter out groundless claims." *Nussle*, 534 U.S. at 528. The fact that the legislation omitted a cause of action against individual federal correction officials supports the "conclusion that Congress considered—and rejected—the possibility of federal damages for" conditions-of-confinement claims such as Kalu's. *Butler*, 999 F.3d at 294–95; *see also Samuels*, 962

F.3d at 112. "[I]n any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant; and here that silence is telling." *Abbasi*, 582 U.S. at 143–44. Implying a damages remedy in this context would have the potential to "upset the careful balance of interests struck by the lawmakers" when enacting legislative and administrative schemes meant to redress prisoner complaints. *Hernandez*, 589 U.S. at 100.

*Third*, consideration of separation of powers principles counsel against extending *Bivens* remedies to Kalu's conditions-of-confinement claim. Congress has directed "control and management of Federal penal and correctional institutions . . . in the Attorney General, who shall promulgate rules for the government thereof." 18 U.S.C. § 4001(b)(1). Under that authority, the BOP has established an internal administrative remedy process designed to allow federal inmates to seek review of issues relating to their confinement. *See* 28 C.F.R. § 542.10(a). The BOP, rather than the judiciary, is therefore tasked with oversight of prison administration. Allowing individual officers to be sued under *Bivens* for conditions-of-confinement claims would "invite intrusive judicial inquiry" into the BOP's administrative decisions. *Mack*, 968 F.3d at 322. "We should hesitate before embarking down such a path," *id.* at 323, as prison administration is "a task that has been committed to the responsibility of [the legislative and executive] branches," *Turner*, 482 U.S. at 85. And since conditions-of-confinement claims are "common," they are "more likely to impose 'a significant expansion of Government liability.'" *Egbert*, 596 U.S. at 500 (quoting *FDIC v. Meyer*, 510 U.S. 471, 486 (1994)). Implying a damages remedy in this novel circumstance therefore risks frustrating Congress' policymaking role and entangling courts in matters committed to the executive branch.

\*\*\*

Heeding the Supreme Court's cautionary language in its recent *Bivens* jurisprudence, we conclude that special factors counsel against expanding *Bivens* liability to the context presented by Kalu's conditions -of-confinement claim. The availability of an alternative remedial scheme through the BOP's ARP, Congress's omission of a standalone damages action in the passage of the PLRA, and separation of powers implications are factors that weigh against allowing the claim to proceed. We therefore hold that Kalu's Eighth Amendment conditions-of-confinement claim is ineligible for *Bivens* remedies.[17] We will affirm the District Court's dismissal of Kalu's conditions-of-confinement claim.

## C.

Kalu next alleges Warden Spaulding violated his Eighth Amendment rights when he failed to protect him against sexual assault inflicted by a prison guard. Kalu seeks damages under *Bivens* to redress that harm. But Kalu's claim against Warden Spaulding fails for two reasons. First, as the District Court correctly found, his complaint does not contain sufficient facts

---

[17] We join the Fourth Circuit in holding that *Bivens* remedies are not available for an Eighth Amendment conditions-of-confinement claim in the prison context. *See Tate*, 54 F.4th at 847–48 (concluding that a prisoner's "conditions-of-confinement claim is not authorized by *Carlson* but instead arises in a 'new context'" and special factors weigh against authorizing *Bivens* remedies for such a claim).

to set forth a plausible claim against the Warden. Second, as defendants argue, his claim is ineligible for remedies under *Bivens* because it arises in a new context and special factors counsel against implying a new damages remedy to his circumstances.

1.

The District Court dismissed Kalu's claim against Warden Spaulding because the "complaint's factual allegations regarding Warden Spaulding are insufficient to allege a facially plausible *Bivens* claim that he was personally involved in the violation of Kalu's constitutional rights."[18] J.A. 23. Kalu argues the District Court "misunderstood" his claim against Warden Spaulding "as being based on the doctrine of respondeat superior or vicarious liability." Appellant's Br. 19 (quotation marks and citation omitted). According to Kalu, his allegations set forth a failure-to-protect or deliberate indifference claim under a "knowledge-and-acquiescence theory of supervisory liability."[19] *Id.* at 20. Even assuming

---

[18] The District Court's order dismissing Kalu's failure-to-protect claim also granted leave to file an amended complaint. Months later, Kalu filed an amended complaint against Warden Spaulding. But after defendants filed a second motion to dismiss, Kalu voluntarily sought to withdraw the amended complaint, and the court granted Kalu's motion and denied defendants' motion to dismiss as moot. Thus, only the allegations in Kalu's original complaint are the subject of this appeal.

[19] The District Court found that Kalu's complaint lacked any "allegation that Warden Spaulding . . . knew of or otherwise

acquiesced in Lt. Middernatch's alleged sexual assault of [Kalu] prior to the email Kalu sent on November 2, 2016." J.A. 22. The District Court therefore interpreted the factual allegations as framing a respondeat superior theory of liability. And, because "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*," *Iqbal*, 556 U.S. at 676, the District Court dismissed the claim. *See* J.A. 23 ("The complaint's factual allegations regarding Warden Spaulding are insufficient to allege a facially plausible *Bivens* claim that he was personally involved in the violation of Kalu's constitutional rights.").

Kalu argues this interpretation was erroneous and his allegations are best understood as raising a deliberate indifference or failure-to-protect claim. Appellant's Br. 18–24. In a *Bivens* action, "each [g]overnment official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Where the claim is based on deliberate indifference or failure-to-protect in violation of the Eighth Amendment, controlling precedent makes clear that a plaintiff must plead each "prison official's deliberate indifference to a substantial risk of serious harm." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997); *see also Farmer*, 511 U.S. at 828.

Kalu's allegations can reasonably be interpreted as raising a deliberate indifference claim. Specifically, Kalu claimed that Warden Spaulding was "responsible for ensuring the security, safety, and well-being of prisoner[s] under his supervision," J.A. 65, knew of the first two instances of sexual assault, *id.* at 67–68, and replied that he would "look into the matter," *id.* at 68. Additionally, Kalu indicated he was removed from the general prison population the same day Warden

Kalu's allegations are properly characterized as raising a deliberate indifference or failure-to-protect claim against Warden Spaulding, we agree with the District Court. His pleadings were insufficient to state a plausible claim against Warden Spaulding.

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss "may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Twombly*, 550 U.S. at 555–56). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S.

---

Spaulding learned about the sexual assault allegations. *Id.* at 67–68. And an internal investigation commenced shortly thereafter. Therefore, the claim is that Warden Spaulding had a duty to ensure Kalu's safety after learning about the risk of sexual violence. *See Washington v. Harper*, 494 U.S. 210, 225 (1990) ("Prison administrators have . . . the duty to take reasonable measures for the prisoners' own safety."). Consequently, while the complaint sought a "species of supervisory liability, it is not *respondeat superior* liability." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010). We therefore proceed by analyzing Kalu's factual allegations as raising a deliberate indifference or failure-to-protect claim against Warden Spaulding.

at 678. And "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quotation marks and citation omitted).

When ruling on a defendant's motion to dismiss, we first outline the elements a plaintiff must plead to state a claim for relief. *Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 73 (3d Cir. 2011). We then disregard any allegations that are "no more than conclusions" and thus "not entitled to the assumption of truth," and determine whether the remaining well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Bivens* liability is predicated on each defendant's own constitutional violations. To state a plausible *Bivens* claim "a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. And the "factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* Applying these standards to Kalu's Eighth Amendment deliberate indifference or failure-to-protect claim, Kalu had to plead sufficient facts to show: "(1) [he] was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to [his] health and safety, and (3) the official's deliberate indifference caused [him] harm." *Shorter*, 12 F.4th at 374 (citation omitted).

Under the second prong of the analysis a prison official may be liable for deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."

48

*Farmer*, 511 U.S. at 847. In this context, deliberate indifference is a subjective standard: "the prison official . . . must actually have known or been aware of the excessive risk to inmate safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001). And the "requisite knowledge of a substantial risk" may be established "in the usual ways, including inference from circumstantial evidence." *Farmer* 511 U.S. at 842.

Prison officials may defeat a deliberate indifference claim in several ways. For example, they may escape liability if they are able to show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. Additionally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

On appeal, Kalu contends that the following "sequence of events" set forth in his complaint plausibly illustrates Warden Spaulding's deliberate indifference—*i.e.*, that the Warden "knew of a substantial risk of serious harm to [Kalu] and yet failed to respond reasonably." Appellant's Br. 19 (quotation marks and citation omitted). Kalu informed Warden Spaulding about the first two instances of sexual assault by sending him "a confidential electronic[] email." J.A. 67. Warden Spaulding replied to the email stating he would "look into the matter and then get back" to Kalu, but Kalu never heard back from the Warden. *Id.* at 68. The same day the email

was sent, Kalu was "taken out of the general population and placed in the Special Housing Unit." *Id.* A week later, Kalu was questioned by the SIS and "was advised that they [would] see [Kalu] again after their investigation." *Id.* at 68–69. After five days, the SIS called Kalu into their office, "told [him] that they had concluded their investigation," "that [Lt. Middernatch] denied the allegation," and that they "believed [Lt. Middernatch's] version of the story." *Id.* at 69. Kalu resisted going back to the prison's general population as he "fear[ed] for his life and to face his assailant." *Id.* at 70. At a hearing regarding his transfer, a third official[20] "threatened to impose numerous sanctions" if Kalu did not drop a complaint he had initiated against Lt. Middernatch and refused to go back to the general population. *Id.* Kalu refused to drop the complaint and was subsequently returned to the prison's general population. Upon his return, Kalu was once again sexually assaulted by Lt. Middernatch. Kalu reported this third instance of sexual assault to Warden Spaulding by sending him another email. Finally, in his complaint, Kalu stated that Warden Spaulding, as the Warden at FCI Allenwood, was "responsible for the operation and wellbeing of prisoners under his supervision." *Id.* at 67.

Accepting all facts as true, and drawing all reasonable inferences in Kalu's favor, he fails to meet even the liberal pleading standard afforded to *pro se* litigants. Kalu's allegations are insufficient to establish the elements of a

---

[20] Specifically, Kalu alleges that DHO K. Bittenbender threatened him with sanctions if he did not drop the sexual assault complaint. The claim against DHO K. Bittenbender is not a part of this appeal.

deliberate indifference or failure-to-protect claim. Kalu's allegations satisfy the first prong of the analysis: being sexually assaulted on two occasions by the same perpetrator, in the same location, and via a similar *modus operandi* poses a substantial risk of future harm. But the complaint's allegations are insufficient to satisfy the second prong of the framework—*i.e.*, that Warden Spaulding was "deliberately indifferent" to a "substantial risk to [Kalu's] health and safety." *Shorter*, 12 F.4th at 374. While Kalu's email communications are enough to show that Warden Spaulding had "actual knowledge" of the risk of continued sexual assault, *Beers-Capitol*, 256 F.3d at 131, Kalu's factual narrative does not establish that Warden Spaulding failed "to take reasonable measures to abate it," *Farmer*, 511 U.S. at 847.

In fact, Kalu's allegations demonstrate that Warden Spaulding took measures to address the situation. Warden Spaulding responded to the first report of sexual assault by having him removed from the general population and commencing an internal investigation conducted by the SIS. The BOP's regulations suggest that removing an inmate from the general population and placing them in SHU can serve to protect the inmate's safety. *See* 28 C.F.R. § 541.21 (describing SHUs as "units in Bureau institutions where inmates are securely separated from the general inmate population," which serve to "ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments"). And the BOP's regulations concerning sexual assault allegations require prison officials to take measures to protect the victim by, for instance, separating them from the alleged abuser. *See id.* § 115.62 ("When an agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it shall take immediate action to

protect the inmate."); *see also id.* § 115.64(a) ("Upon learning of an allegation that an inmate was sexually abused, the first security staff member to respond to the report shall be required to: (1) [s]eparate the alleged victim and abuser . . . ."). Kalu was only returned to the general population after the SIS concluded its investigation. This series of events illustrates that Warden Spaulding "responded reasonably to the risk." *Farmer*, 511 U.S. at 844. Such a conclusion frees an officer from liability "even if the harm ultimately was not averted." *Id.*

The Eighth Amendment requires prison officials to ensure a prisoner's "reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). That standard "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844–45 (quotation marks and citation omitted). Drawing all inferences in Kalu's favor, his complaint fails to establish Warden Spaulding acted with deliberate indifference—or unreasonably—by removing Kalu from the general prison population and commencing an investigation into the allegations of sexual assault. We therefore conclude his complaint fails to set forth sufficient allegations to make out a plausible claim against Warden Spaulding.

2.

In any event, Kalu's deliberate indifference claim against Warden Spaulding is ineligible for *Bivens* remedies because it presents a novel context and special factors counsel against a *Bivens* extension in this context.[21] "Although *Bivens*

---

[21] Kalu argues defendants have forfeited their alternative argument that Kalu's deliberate indifference or failure-to-

protect claim is ineligible for remedies under *Bivens*. *See* Appellant's Reply Br. 9. Specifically, he contends "arguments raised in footnotes are generally forfeited," and we "should not make an exception here." Appellant's Reply Br. 9 (citing *United States v. Yung*, 37 F.4th 70, 81 (3d Cir. 2022)).

"[F]orfeiture is the failure to make the timely assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993). Arguments not raised in an opening brief, *see In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016), and "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered [forfeited]," *Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) (alteration in original) (citation omitted). "Because of the important interests underlying the preservation doctrine, we will not reach a forfeited issue in civil cases absent truly 'exceptional circumstances.'" *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) (quoting *Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001)).

Here, the District Court did not decide whether Kalu's deliberate indifference or failure-to-protect claim was eligible for remedies under *Bivens*. *See* J.A. 20–23 (discussing only whether Kalu's complaint alleged sufficient personal involvement by Warden Spaulding to set forth a claim against him). On appeal, defendants raised the issue in a footnote in their opposition brief. *See* Appellee's Br. 13 n.3 ("Although the district court did not have occasion to rule on the *Bivens*-eligibility of the claims against Warden Spaulding, they are also precluded by *Egbert* for the same reasons that the claims against Lt. Middernatch are.").

However, we are not necessarily precluded from addressing defendants' *Bivens*-eligibility argument. We have discretionary authority to address forfeited issues under exceptional circumstances. *See Webb v. City of Philadelphia*, 562 F.3d 256, 263 (3d Cir. 2009). Such circumstances exist where "the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues." *Philip Morris Inc.*, 250 F.3d at 799. And we are slightly less reluctant to bar consideration of a forfeited pure question of law. *Barna*, 877 F.3d at 147; *see also N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 305 (3d Cir. 2014) ("It is appropriate for us to reach an issue that the district court did not if the issues provide purely legal questions, upon which an appellate court exercises plenary review." (quotation marks and citation omitted)).

Considering these principles, we find it appropriate to consider defendant's *Bivens*-eligibility argument. *First*, resolution of this issue is one of public importance. *See, e.g.*, *Wagner v. PennWest Farm Credit, ACA*, 109 F.3d 909, 911 (3d Cir. 1997) ("While we will ordinarily not consider issues raised for the first time on appeal, . . . . [i]n this case, the existence (or, more accurately, the non-existence) of a private right of action under the [Agricultural Credit Act] is so fundamental to the claims alleged in the district court that we cannot address the issues raised by the parties without first deciding whether there is a private right of action."). In its most recent opinion concerning *Bivens*, the Supreme Court reversed a Court of Appeals's decision allowing two constitutional damages actions to proceed noting that its "cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Egbert*, 596

damages are available for some deliberate-indifference claims, this case is meaningfully different." *Dongarra*, 27 F.4th at 180. The Supreme Court has recognized only three *Bivens* contexts, none of which involve deliberate indifference to *officer*-on-inmate violence. *Carlson* recognized a cause of action for an officer's failure to provide adequate medical treatment. But here, Kalu seeks damages for Warden Spaulding's alleged

---

U.S. at 486. This appeal likewise raises the issue of the propriety of *Bivens* remedies in a given context "and presents a weighty question of public concern." *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 417 (3d Cir. 2011). *Second*, "[t]he argument omitted in the District Court is a pure question of law, and one that is closely related to arguments that [Kalu] did raise in that court." *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005). *Third*, we "may uphold a judgment on any proper theory, even if not raised by the parties first in the district court, as long as there is no prejudice to the other party," *Wagner*, 109 F.3d at 911, and such is the case here. The new argument raised on appeal is presented as a ground for affirming the District Court, and Kalu would suffer no prejudice as he has had a fair opportunity to defend the case on that basis. *See* Appellant's Reply Br. 9 (arguing that Kalu's "failure-to-protect claim is *Bivens*-eligible because it arises in the context presented in *Farmer*, which addressed a prison official's 'deliberate indifference' to the risk of assault to an inmate, regardless of the perpetrator"); *see also* Arg. Tr. 28:21–30:11 (arguing that the failure-to-protect claim is *Bivens*-eligible because it "arises in the same context as *Farmer* and the same context" as *Bistrian* and *Shorter*). We therefore exercise our discretion to reach the issue of whether Kalu's claim against Warden Spaulding is suitable for damages under *Bivens*.

failure to protect him from sexual abuse inflicted by a prison guard. The difference in the "mechanism of injury" between Kalu's claim and the one recognized in *Carlson* is sufficient to find that Kalu's case presents a modest extension of *Bivens*. *See Abbasi*, 582 U.S. at 138. And the "fact that [Kalu's] claim arose in a different prison setting is highly relevant" as it "indicates that [Kalu's] suit might implicate policy determinations that the Supreme Court did not consider in *Carlson*." *Sargeant*, 87 F.4th at 366.

Our conclusion that Kalu's deliberate indifference or failure-to-protect claim presents a new context is bolstered by the Supreme Court's decision in *Abbasi*. There, the Court considered a claim that a federal correction warden "violated the Fifth Amendment by allowing prison guards to abuse" prisoners. *Abbasi*, 582 U.S. at 146. While the Court noted that the case had "significant parallels" to its decision in *Carlson* because both concerned a "claim for prisoner mistreatment," it found that the claim presented a modest extension of *Carlson* and thus a new context. *Id.* at 146–47. The cases were distinct because they invoked different constitutional provisions, and the judicial guidance available to the warden in *Abbasi*, with respect to his supervisory duties, was less developed. *Id.* at 147–48. The standard for claims alleging failure to provide medical treatment to a prisoner—namely, "deliberate indifference to serious medical needs," *Estelle*, 429 U.S. at 104—was clearly established by the Court's precedents. *Abbasi*, 582 U.S. at 148. But the "standard for a claim alleging that a warden allowed guards to abuse detainees [was] less clear under the Court's precedents." *Id.* The Court's reasoning applies here and bolsters our conclusion that Kalu's claim arises under a new *Bivens* context.

Next, the presence of "potential special factors that previous *Bivens* cases did not consider" weighs against extending *Bivens* liability to Kalu's claim. *See id.* at 140. As the Supreme Court recently explained, while its *Bivens* "cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492. Here, we have enough reasons to determine that the political branches are "better equipped to decide whether existing remedies 'should be augmented by the creation of a new judicial remedy.'" *Id.* at 493 (quoting *Bush*, 462 U.S. at 388).

*First*, we consider whether Congress "already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id.* (quoting *Abbasi*, 582 U.S. at 137). The Supreme Court has emphasized that "the relevant question is not whether a *Bivens* action would disrupt a remedial scheme," "whether the court should provide for a wrong that would otherwise go unredressed," or whether "existing remedies do not provide complete relief." *Id.* (quotations marks, citations, and alterations omitted). Rather, an alternative remedial scheme is sufficient so "long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence." *Id.* at 498. Such is the case here. The BOP's ARP is an "administrative review mechanism[]" established by the political branches that "foreclose[s] the need to fashion a new, judicially crafted cause of action." *Malesko*, 534 U.S. at 68. As a federal inmate, Kalu had access to the BOP's ARP, and he attempted, albeit unsuccessfully, to seek redress through that forum. The existence of an alternative remedy through the BOP's administrative program is thus a special factor

counseling against a *Bivens* extension.

*Second*, we consider whether congressional legislation already exists in this context. *Abbasi*, 582 U.S. at 143–44. As previously discussed, Congress paid close attention to federal inmate constitutional claims when passing the PLRA and opted not to create a new cause of action against individual officials. The Act requires exhaustion of administrative remedies before filing suit, bars prisoners from recovering from "mental or emotional injury" unless an inmate can show a "physical injury" or "sexual act," and prohibits prisoners from proceeding *in forma pauperis* if they have filed three or more prior actions that were dismissed without legal basis. *See* 42 U.S.C. § 1997e. The PLRA's scheme suggests that "Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent.'" *Abbasi*, 582 U.S. at 143 (quoting *Schweiker*, 487 U.S. at 423). "This possibility counsels hesitation 'in the absence of affirmative action by Congress.'" *Id.* (quoting *Bivens*, 403 U.S. at 396).

*Third*, we consider the risk of judicial interference with the functioning of another branch. *Abbasi*, 582 U.S. at 140. Recognizing any new *Bivens* action "entail[s] substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Egbert*, 596 U.S. at 499 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). In the prison setting, this risk is heightened because, as the Supreme Court has emphasized,

> [r]unning a prison is an inordinately difficult undertaking that requires expertise, planning,

and the commitment of resources, all of which
are peculiarly within the province of the
legislative and executive branches of
government. Prison administration is, moreover,
a task that has been committed to the
responsibility of those branches, and separation
of powers concerns counsel a policy of judicial
restraint.

*Turner*, 482 U.S. at 84–85.

Allowing Kalu to proceed with his claim against
Warden Spaulding, as a supervisor, for his handling of Kalu's
sexual assault allegation would invariably invite intrusion
administration of federal prison policies—determinations
ranging from housing and safety, to discipline and resources.
Since we "are not in a position to second-guess the
administrative policies and functions historically within the
executive's domain, we must exercise restraint if judicial
intervention would ultimately interfere with executive
functions." *Mack*, 968 F.3d at 322. With that caution in mind,
we find that separation of powers principles counsel against a
*Bivens* extension in this sphere.

\*\*\*

In sum, Kalu's Eighth Amendment deliberate
indifference claim against Warden Spaulding is ineligible for
damages under *Bivens*. We hold his claim presents a new
*Bivens* context and special factors counsel against extending

*Bivens* liability to his set of facts.[22] We will affirm the District Court's dismissal of Kalu's deliberate indifference or failure-to-protect claim.

## IV.

In recent years, the Supreme Court has indicated that if it had to decide *Bivens* today, it "would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. at 502. It is the province of the legislature, not the judiciary, to weigh the costs and burdens associated with creating new causes of action for damages under constitutional provisions. With these principles in mind, we conclude that Kalu's Eighth Amendment claims present novel *Bivens* contexts, and special factors counsel against extending liability to his circumstances.

---

[22] We join the Fourth and Ninth Circuits in holding that *Bivens* remedies are not available for Eighth Amendment deliberate indifference or failure-to-protect claims in the prison setting. *See Bulger*, 62 F.4th at 141 (concluding that an Eighth Amendment failure-to-protect claim brought by a prisoner's estate was ineligible for *Bivens* remedies because "Congress has expressed a desire to prevent courts from interfering with BOP decisions," has been "conspicuously silent about creating a remedy for prisoners to obtain damages from individual officers," and "the existence of the ARP and PLRA counsel hesitation in extending *Bivens*" (quotation marks and citation omitted)); *Chambers*, 78 F.4th at 1106 ("No case has extended *Bivens* to claims that BOP employees violated the Eighth Amendment by failing to protect an inmate from other staff members.").

For the foregoing reasons, we will affirm the District Court's dismissal of Kalu's claims.

RESTREPO, *Circuit Judge*, concurring.

Although I agree with the Majority that this case presents a new *Bivens* context, I write separately to highlight the alarming reports of pervasive staff-on-inmate sexual abuse within the Bureau of Prisons and corresponding flaws in the administrative remedy process, and to note recent actions the Department of Justice, the United States Sentencing Commission, and Congress have taken since those findings were disclosed.

In 2022, following an investigation of alleged sexual abuse by a BOP employee, the DOJ's Office of the Inspector General (OIG) sent a Management Advisory Memorandum to notify BOP of "serious concerns" it had "with the manner in which BOP handles investigations of alleged misconduct by BOP employees." DOJ OIG, No. 23-001, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees* 1 (Oct. 12, 2022), https://oig.justice.gov/sites/default/files/reports/23-001.pdf [https://perma.cc/Z5D3-25GF] (MAM 23-001). The concerns raised in the memorandum, which remain partially unresolved, suggest that the Executive Branch does not find BOP's administrative process sufficient to secure an adequate level of deterrence in this context.[1]

---

[1]   *See also* The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal*

OIG's seventeen-page memorandum detailed its "significant concern" over BOP's statement that,

> [I]n cases that have not been accepted for criminal prosecution, the BOP will not rely on inmate testimony to make administrative misconduct findings and take disciplinary action against BOP employees, unless there is evidence aside from inmate testimony that independently establishes the misconduct, such as a video capturing the act of misconduct, conclusive forensic evidence, or an admission from the subject.

MAM 23-001 at 1. OIG noted that this policy was "inconsistent with the fact that such testimony is fully admissible in criminal and civil cases," and inconsistent with "those DOJ regulations implementing the Prison Rape Elimination Act (PREA), [which] require the credibility of an alleged victim to be assessed on an individual basis and not be determined by the person's status as an inmate." *Id.* at 2.

OIG also noted that "the BOP is disproportionately concerned about the risk of losing an adverse action appeal to the [Merit Systems Protection Board] to the exclusion of other

---

*Bureau of Prisons* (Nov. 2, 2022), https://www.justice.gov/d9/pages/attachments/2022/11/03/20 22.11.02_bop_sexual_misconduct_working_group_report.pdf [https://perma.cc/99Q3-S94U] (PDAG Report), (discussing deficiencies with prevention, reporting, investigations, prosecution, and the use of administrative actions and discipline of BOP employees who commit sexual misconduct).

highly significant risks." *Id.* at 8. Specifically, OIG warned that BOP's reluctance to rely on an incarcerated person's testimony "enhances the likelihood that employees who have engaged in serious misconduct, including sexual abuse of a ward, will avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential for serial misconduct." *Id.* at 8–9.

OIG made three recommendations to BOP, two of which OIG marked as "resolved." *Id.* at 14–15. Those recommendations included issuing immediate written notifications to BOP employees that there is no prohibition against substantiating employee misconduct based on inmate testimony, and providing training to all BOP employees involved with administrative misconduct matters on the preponderance of the evidence standard. *Id.* Notably, the "unresolved" concern involved the BOP's resistance to the recommendation that it "create a policy regarding the proper handling of inmate statements in administrative matters" that is consistent with the PREA's guidance on inmate credibility assessment. *Id.* at 14.

In its annual letter to the United States Sentencing Commission, DOJ urged the Commission to address concerns regarding the increasing number of cases involving sexual abuse committed by law enforcement or correctional personnel against victims in their custody, care, or supervision. *See* U.S. Sent'g Comm'n, *2023 Amendments in Brief: Amendment #816 Sexual                    Abuse                    Offenses*, https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_816.pdf [https://perma.cc/TP8S-MZB5].    In response, the 2023

amendments to the U.S. Sentencing Guidelines included an increase in the base offense level at §2A3.3 (Criminal Sexual Abuse of a Ward or Attempt to Commit Such Acts) from 14 to 22 for cases involving sexual abuse committed by law enforcement or correctional personnel against incarcerated victims.

The Sentencing Commission also modified the list of specified extraordinary and compelling reasons for compassionate release to add a ground for relief which applies if an incarcerated person has suffered sexual or physical abuse that was committed by or at the direction of a correctional officer, an employee or contractor of BOP, or any other individual having custody or control over that person. *See* USSG §1B1.13. This provision responds to DOJ's suggestion that a sentence reduction may be appropriate where an individual in BOP custody has been determined to have been the victim of sexual assault perpetrated by BOP personnel. *See* PDAG Report at 3, 21–22.

Commentators have noted potential hurdles that survivors pursuing motions for compassionate release may face, however, due to the requirement that an incarcerated person's claim of sexual abuse "must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding." *See* FAMM, *Comments on Proposed 2023 Amendments to the Federal Sentencing Guidelines* (Mar. 14, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202303/88FR7180_public-comment.pdf#page=1052    [https://perma.cc/TVR6-NFQU]. According to the Bureau of Justice Statistics, from 2016 to

2018, perpetrators of staff sexual misconduct were only convicted, sentenced, fined, or pleaded guilty in six percent of substantiated incidents in prisons. *See* U.S. DOJ, Bureau of Justice Statistics, *Substantiated Incidents of Sexual Victimization Reported by Adult Correctional Authorities, 2016–2018* 15, (Jan. 31, 2023), https://bjs.ojp.gov/document/sisvraca1618.pdf [https://perma.cc/SZ9L-UDPC].

The Senate Committee on Homeland Security and Governmental Affairs' Permanent Subcommittee on Investigations, chaired by Senator Jon Ossoff, also reported on sexual abuse of incarcerated individuals in BOP custody—specifically incarcerated women. The Subcommittee's 2022 report details the widespread abuse that occurred at Metropolitan Correctional Center New York, Metropolitan Detention Center Brooklyn, Federal Correctional Complex Coleman in Florida, and especially Federal Correctional Institution (FCI) Dublin in California,[2] where eight federal

---

[2]  The closure of FCI Dublin, dubbed "the rape club," was announced on April 15, 2024, just ten days after Judge Yvonne Gonzalez Rogers appointed a special master for independent oversight of the facility. *See* Christopher Weber, *Senators demand accounting of rapid closure plan for California prison where women were abused*, AP News (Apr. 24, 2024), https://apnews.com/article/fci-dublin-california-prison-shutdown-86b7284ca597d89269a1af301c02eed3 [https://perma.cc/U89M-LS68]. Following "disturbing reports" of "ensuing chaos," related to the closure and subsequent transfer of over 600 incarcerated women at the facility as well as "hostility and retaliation" against individuals in custody, a group of senators urged the BOP to take

corrections officers—including the warden, chaplain, and former PREA compliance officer responsible for training supervisors on the PREA requirements and coordinating the PREA audit—were indicted for sexually abusing incarcerated women.[3] *See* Staff of Permanent S. Subcomm. on Investigations, 117th Cong., *Rep. On Sexual Abuse of Female Inmates In Federal Prisons* 2 (Comm. Print 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf [https://perma.cc/CT8Q-YSKK].

The Subcommittee's report includes findings that BOP employees sexually abused incarcerated women in at least two-thirds (19 of 29 facilities) of federal prisons that held women over the past decade, and that as of October 28, 2022, BOP's Office of Internal Affairs (OIA) had a backlog of approximately 8,000 cases alleging employee misconduct, including at least hundreds of sexual abuse cases. *Id.* at 1, 24–25. The Subcommittee's investigation also provides insight into the low number of criminal prosecutions of BOP officers who admitted to crimes of abuse in sworn statements: when a

---

"immediate action" to ensure that individuals impacted by the closure "receive appropriate medical attention and proper care as required by the Constitution, federal laws, BOP policy, and the dictates of common decency." Letter to BOP Director Colette Peters (April 24, 2024), https://www.booker.senate.gov/imo/media/doc/letter_to_bop_fci_dublin.pdf [https://perma.cc/PT5C-DR68].

[3] As of March 2024, seven of the eight had been sentenced after convictions at trial or plea deals.

BOP employee admits to sexual misconduct in a compelled interview, statements made during that interview cannot be used against them in a criminal prosecution by OIG or any other law enforcement entity. *Id.* at 13 (discussing *Garrity v. New Jersey*, 385 U.S. 493 (1967)). Thus, subjects of BOP investigations who admit to crimes are effectively immunized from criminal prosecution.

The bipartisan Federal Prison Oversight Act, which President Joe Biden recently signed into law, is Congress's swift response to the Subcommittee's investigation and report. The new law provides for the establishment of an inspections regime to be implemented by the Inspector General of the DOJ, and an independent Ombudsman who may receive complaints regarding issues adversely affecting the health, safety, welfare, or rights of incarcerated people or staff at federal prisons. *See* Federal Prison Oversight Act, Pub. L. No. 118-71 (2024). While this important legislation provides much needed safeguards, the provision of a civil legal remedy for survivors of staff-on-inmate abuse is notably absent from the text of the statute. This absence, *Egbert* cautions us, may lend "reason to think Congress might doubt the efficacy or necessity of a damages remedy" in cases such as the one before us. *See Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)).

Bound as we are by the Supreme Court's unwillingness to expand *Bivens* to any new context, I reluctantly concur in the judgment.